1 | DON G. RUSHING *(admitted pro hac vice)*
WILLIAM V. O'CONNOR, JR. *(admitted pro hac vice)*
2 | MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
3 | San Diego, CA  92130-2040
Telephone: (858) 720-5100
4 | Facsimile: (858) 720-5125
DRushing@mofo.com
5 | WOConnor@mofo.com

6 | CARRIE MCCREA HANLON
PYATT SILVESTRI & HANLON
7 | 701 Bridger Avenue, Suite 600
Las Vegas, Nevada  89101
8 | Telephone: (702) 383-6000
Facsimile: (702) 477-0088
9 | CHanlon@psh-law.com

10 | Attorneys for Defendant
ALASKA AIRLINES, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| REDA A. GINENA, NAHID I. GINENA, AMRE R. GINENA, SABRINA KOBERT, M. MAGDY H. RASIKH, M. SAMIR MANSOUR, AZZA EID, NAZMI M. NAZMI, and HEBA NAZMI, <br><br> Plaintiffs, <br><br> v. <br><br> ALASKA AIRLINES, INC., <br><br> Defendant. | Case No.   CV-S-04-1304-RCJ-LRL <br><br> **ALASKA AIRLINES, INC.'S OBJECTION TO THE DECLARATION OF CAPTAIN MARK S. SWINT** |

Defendant ALASKA AIRLINES, INC. hereby objects to, and moves to strike, the following paragraphs of the Declaration of Captain Mark S. Swint for the reasons stated.

| STATEMENT | OBJECTION |
|---|---|
| 1. It is my expert opinion that Captain Swanigan did not have reasonable grounds to believe that a person had committed, or was about to commit, on board the aircraft, an offence, or an act contemplated in Article 1, paragraph 1, of the Tokyo Convention. Because he did not have reasonable grounds to believe any person or persons had committed, or were about to commit an offence or an act contemplated in Article 1, paragraph 1 b) his decision to divert flight 694 to Reno on September 29, was both capricious and arbitrary.<br><br>Page 6, lines 9-15. | Inappropriate subject for expert testimony. An expert cannot give an opinion as to his legal conclusion, i.e., an opinion on an ultimate issue of law. FRE 704. |
| 2. Article 9, paragraph 1 says that the aircraft commander may deliver to the competent authorities of any Contracting State in the territory of which the aircraft lands any person who he has reasonable grounds to believe has committed, on board the aircraft an act which, in his opinion, is a serious offence according to the penal law of the State of registration of the aircraft. Since Captain Swanigan had no knowledge of the facts aboard his aircraft, he had no cause to believe that any offence either had been committed or contemplated. He arbitrarily decided that all nine members of the Ginena party were guilty and he acted capriciously by demanding the arrest of the entire party.<br><br>Page 6, lines 16-24. | Inappropriate subject for expert testimony. An expert cannot give an opinion as to his legal conclusion, i.e., an opinion on an ultimate issue of law. FRE 704. |
| 3. The application of even the most basic elements of CRM would almost certainly have brought about a quick and much less eventful resolution to the incident at issue. The failure to do so certainly facilitated the continuation and escalation of the incident, allowing it to develop far out of proportion to what it merited.<br><br>Page 8, lines 3-7. | Inappropriate subject for expert testimony. An expert cannot give an opinion as to his legal conclusion, i.e., an opinion on an ultimate issue of law. FRE 704. Speculative and lacks foundation. FRE 602. |

| STATEMENT | OBJECTION |
|---|---|
| 4. If, in fact, the situation was just a "bit of a problem" and she's "got it under control" the appropriate response from Captain Swanigan would have been to press Ms. Callaway further as to why she felt authorities were needed. This interrogatory need not have been in the form of a challenge to her but rather a simple attempt to understand the situation. This most likely would have led to a brief explanation, from Ms. Callaway, of the events that transpired up to that point. At that point a prudent captain would have offered to turn on the seat belt sign and make a strongly worded announcement directing passengers to take their seats. The captain may even have directed his comments towards the particular passengers involved.<br><br>Page 9, line 21-page 10, line 2. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402, 602. |
| 5. Captain Swanigan's only query to Ms. Callaway was to ask if there was anything urgent, anything they needed to know? (Swa dep. 94:8-9). However, professional standards require that we must go beyond simple yes or no questions if we want true communication. A yes or no question is one that is answered with a simple yes or no. We are obligated, instead, to ask 'who, what, why and how' questions that require a more complete answer. This event highlights the validity of that concept. Ms. Callaway was able to answer Captain Swanigan's question with a simple "no, I think I've got it under control!" (Swa dep. 94:9). Had she been obligated to answer a `what' question such as, `what is going on back there?' she would have been compelled to respond with more detail.<br><br>Page 10, lines 3-12. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402, 602. |

| STATEMENT | OBJECTION |
|---|---|
| **6.** The decision to make a request for authorities is serious and a captain should only do so when he determines that the conditions warrant further action. Article 9 paragraph 1 of the Tokyo Convention clearly indicates that an aircraft commander could deliver to competent authorities, persons who he had reasonable grounds to believe had committed or were about to commit serious offences on board his aircraft. Captain Swanigan's own testimony indicates that he agreed to make such a request based only Ms. Callaway's petition, (Swa 94:11-22), with no knowledge of, or indication that, any offence had or was about to be committed. Furthermore, he made no attempt to establish that there was any basis for having the passengers remanded to the authorities.<br><br>Page 10, lines 13-22. | Inappropriate subject for expert testimony. An expert cannot give an opinion as to his legal conclusion, i.e., an opinion on an ultimate issue of law. Speculative. FRE 704. |
| **7.** As the commanders of the aircraft we are responsible to act as leaders and be prudent in our decisions. A few simple follow-up questions to such a request as Ms. Callaway's would have provided much needed information. This does not take much time and is not difficult to accomplish during the cruise portion of the flight when the autopilot has control of the airplane and the workload is light.<br><br>Page 10, lines 23-27. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |
| **8.** It is unreasonable and unprofessional to call for police without knowing why they are being requested. I have never seen a captain take such action based solely on the request of a flight attendant. This is not to say that the flight attendant's perceptions and desires are not to be respected. Rather, it is the first step in a chain of inquiry that may or may not lead to further action.<br><br>Page 11, lines 1-5. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |

| STATEMENT | OBJECTION |
|---|---|
| **9.**     It was during this exchange that Ms. Callaway called for the second time. This was a second opportunity for Captain Swanigan to ask the questions he should have asked on the prior occasion. He states that he could hear yelling in the background through the interphone.  Yet, once again, he took no thought to ask, `Who's yelling?' or `What's going on back there?" Had he done so he would have learned that it was, in fact, Ms. Duus who was being the most vocal, (ASA 007 & Shealy dec 3) and that the passengers were in their seats (Cal dep. 147-148 & Shealy dec.).  He would have also learned that the argument was, at this point, over paperwork and forms.<br><br>Page 12, lines 7-15. | Irrelevant to Alaska Airline motion under the Tokyo Convention.  Speculative.  FRE 402. |

| STATEMENT | OBJECTION |
|---|---|
| **10.** Instead, Captain Swanigan made the instant decision to divert the plane to Reno rather than continuing on to the intended destination, Las Vegas. At the time of this decision the airplane was approximately 100 nm past Reno and 200 NM from Las Vegas. At that point the difference in flight time was approximately 25 minutes. This is based on the fact that although the normal arrival procedures at Las Vegas require considerable vectoring, which would take additional time, an aircraft which requests expedited handling can avoid that and receive a more direct clearance to the runway. This is standard in such events and is similar to the type of handling that Alaska Airlines flight 694 received from the Reno controllers.<br><br>Page 12, lines 16-24. | Lacks foundation. Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402 |
| **11.** Captain Swanigan has stated that he was on the ground in Reno within about 8-10 minutes (Swa dep. 106:4) from approximately 100 miles away. In fact, I believe the time was closer to 12-15 minutes based on aircraft performance and regulatory constraints regarding airspeed at low altitudes. The additional 100 miles of distance to continue on to Las Vegas would have been flown at cruise altitudes and would have been traversed in about 12-13 minutes depending on high altitude winds. Altogether the difference should have been about 22-25 minutes.<br><br>Page 12, line 25-page 13, line 4. | Lacks foundation. Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |

| STATEMENT | OBJECTION |
|---|---|
| **12.** At this point Captain Swanigan had several options available to him. One concern should have been for the safety and welfare of his A flight attendant. Why was she distraught? What could he do to help her? Should he call on the flight attendants in the back to change places with her and give her a break? A more important question for him to ask would have been, "why are you crying? What is going on back there?" <br><br> Page 13, line 24-page 14, line 2. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |
| **13.** In light of the improvements that have been made in 'crew concept' behavior, it is difficult to understand how Captain Swanigan could have allowed this event to escalate to the level that it did without ever asking anything about it. <br><br> Page 14, lines 3-5. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |
| **14.** The use of the viewing port, located in the cockpit door, is another effective form of inquiry available to pilots. After the events of 9/11/2001, the Federal Aviation Administration mandated that all 6,000 commercial airliners in the United States be retrofitted with reinforced cockpit doors by April 9, 2003, (FAA Press Release APA 01-02). One of the significant improvements made to the doors designed for Alaska Airlines, in addition to their enhanced impenetrability, was the installation of a "thick acrylic window" (Alaska Airlines press release 10/16/2001). The larger viewing port was installed to give pilots a better idea of the activities occurring on the other side. <br><br> Page 14, lines 6-14. | Lacks foundation. Speculative. Captain Swint offers no basis for his determination that a specific model door was installed on the subject aircraft. |

sd-298110                                      7                          CASE NO. CV-S-04-1304-RCJ-LRL
ALASKA AIRLINES' OBJECTION TO DECLARATION OF CAPTAIN MARK S. SWINT

| | STATEMENT | OBJECTION |
|---|---|---|
| | **15.** This viewing port is significantly larger that the common 'peep hole' of the average hotel room with which we are all familiar. It provides a significantly clearer view and is designed to give the pilots an adequate idea of the circumstances on the other side of the door. The viewing port is mounted in the door and is within arm's reach of the pilots when seated. It is a simple matter to stand up, turn around taking no more than one step and look through the port. The entire process takes less than 5 seconds. It is clear from the depositions of both the pilots that neither one availed themselves of this resource.<br><br>Page 14, lines 15-22. | Lacks foundation. Speculative. Captain Swint offers no basis for his determination that a specific model door was installed on the subject aircraft. |
| | **16.** According to the depositions of both Ms. Callaway and Ms. Duus, as well as the declaration of Ms. Kimberlie Shealy, the most vocal part of the conflict occurred after the involved passengers had returned to their seats and were otherwise behaving (Cal dep 147-148, Duus Dep. 35:12-14, Shealy dec.3:7-9). It is logical to assume that if either Captain Swanigan or F/O Roberts had looked through the port and seen that all the passengers were seated they would have felt the need to investigate further before taking such drastic measures as they did.<br><br>Page 14, line 23-page 15, line 2. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |

| STATEMENT | OBJECTION |
|---|---|
| **17.** In fact, First Officer James Roberts confirms this.  He was asked in his deposition, "If you and the captain had been aware at the time that she told you that she was losing control of the first class cabin, all those passengers had in fact taken their seats and were just having an argument, would you have deemed that to be a situation that required the airplane to be diverted?"  His response was, "It would certainly be a lower threat level than if they were standing up, but it would still be-it would still be threatening behavior, I suppose, but it would call for perhaps a less drastic response, I guess."  (Roberts dep. 77:1-13)<br><br>Page 15, lines 3-10. | Irrelevant to Alaska Airlines motion under the Tokyo Convention.  Speculative.  FRE 402. |
| **18.** My primary responsibility as an Interview Captain, involved in the assessing and hiring of pilot applicants, was to evaluate an individual pilot's suitability for employment at United Airlines based on their accounts of various events that they had experienced during their flying careers.<br><br>Page 15, lines 19-22. | Irrelevant to Alaska Airlines motion under the Tokyo Convention.  FRE 402. |

| STATEMENT | OBJECTION |
|---|---|
| **19.** Interview Captains and Human Resource representatives would ask questions designed to elicit stories from the applicant. These responses would be followed up with probing questions which were used to get to the finer details of what had transpired. Stories such as the event in question here were not at all uncommon, although never did I see a final result such as this. However, in the interview, the final resolution of the events was not so important to us as were the methods and steps taken to get to that resolution. We wanted to know specifically what actions the captain had taken prior to making his decisions. Those actions were measured against a set of criteria established by commonly accepted standards.<br><br>Page 15, line 23-page 16, line 5. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |
| **20.** It is universally understood, and accepted as the standard industry wide, that a captain has the authority and the latitude to take whatever reasonable action he deems necessary. The effective command of an aircraft is not a democracy. However, captains are held responsible and accountable for the exercise of such command and expect him to exercise due diligence prior to taking that action. Actions taken in haste and without an understanding of the pertinent facts are unreasonable and in some cases even dangerous.<br><br>Page 16, lines 6-11. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |

| STATEMENT | OBJECTION |
|---|---|
| **21.** Had Captain Swanigan related this story during a pre-employment interview, the Interview Captain's first response or follow up question would have been, `When your flight attendant requested that the authorities meet the plane did you ask her what was going on and why she felt the authorities were needed?' That would have been followed up with, "Did you and the flight attendant discuss any other options or methods for dealing with the passengers that she might try first?"<br><br>Page 16, lines 13-18. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |
| **22.** Another appropriate question would have been, "Do you think a warning or admonition from you, as the captain, transmitted by her to the passengers might have helped calm the situation?". It would have been appropriate to ask if he had attempted to speak to the other flight attendants in order to get their assessment of the events that were transpiring.<br><br>Page 16, lines 19-23. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |
| **23.** Based on this story, Captain Swanigan would not have been successful in an interview with United Airlines not because he diverted to an alternate destination but because he did so without any attempt whatsoever to ascertain the pertinent facts or exercise his leadership and command authority to help resolve the situation.<br><br>Page 16, line 24-page 17, line 2. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |
| **24.** There was no urgency in the cabin. No one was trying to breach the security of the cockpit door. No one was threatening the crew or the other passengers with any form of bodily harm. No threats were made towards the safety of the aircraft itself. Absolutely nothing was accomplished by diverting the plane to Reno.<br><br>Page 17, lines 10-14. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |


| STATEMENT | OBJECTION |
|---|---|
| **25.** The only issue in the passenger cabin was a disagreement between some passengers and the flight attendant. The fact that the situation was resolvable is proven by the fact that the passengers did, in fact sit down, as evidenced by F/A Duus' statement that, "They were quiet after our captain called back and informed us that we were in lockdown." (Duus Dep. Pg. 37:19-25)<br><br>Page 17, lines 15-19. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |
| **26.** Amore timely and direct involvement by Captain Swanigan would have easily stopped this event before it escalated beyond a brief dispute between a flight attendant and a passenger.<br><br>Page 17, lines 20-22. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |
| **27.** Oddly, though Captain Swanigan was too passive in flight, he became overly aggressive once on the ground. He wanted all nine passengers removed from the plane and arrested on the spot, even though Ms. Duus has stated in her deposition that only a few of the passengers were involved in any way. In fact, Ms. Duus states clearly that the passenger seated in 3D was, "basically trying to get everybody not to talk anymore." (Duus dep. 34:11-12). Ms. Callaway states, of the lady in seat 1A, that, "she was more of the one that was trying to get everybody kind of calmed down. I remember her being the voice of reason of the whole." (Call dep 169:13-24).<br><br>Page 17, line 23-page 18, line 4. | Irrelevant to Alaska Airlines motion under the Tokyo Convention. Speculative. FRE 402. |

ALASKA AIRLINES' OBJECTION TO DECLARATION OF CAPTAIN MARK S. SWINT

| STATEMENT | OBJECTION |
|---|---|
| **28.** Captain Swanigan's insistence that the entire group be criminally charged appears arbitrary and capricious. He certainly had no reason or evidence to believe that all nine passengers were equally culpable of whatever offence he assumed had been committed.<br><br>Page 18, lines 5-8. | Inappropriate subject for expert testimony. An expert cannot give an opinion as to his legal conclusion, i.e., an opinion on an ultimate issue of law. Speculative. FRE 704. |
| **29.** The inaction on the part of the Captain to assist the flight attendants created the opportunity for the flight attendants to inflame the situation with ill-timed issuance of demands, forms and threats. As a result more than seventy people were delayed and inconvenienced and significant expense was incurred by Alaska Airlines. A few simple questions and actions in the beginning could have avoided it all.<br><br>Page 18, lines 9-14. | Inappropriate subject for expert testimony. An expert cannot give an opinion as to his legal conclusion, i.e., an opinion on an ultimate issue of law. Speculative. FRE 704. |
| **30.** It is my opinion, that it was impossible for Captain Swanigan to have had reasonable grounds to believe, due to his lack of inquiry and willingness to provide leadership in this event, that any offence was being or about to be committed by any passenger on board Alaska Airlines flight 694. His actions were arbitrary and capricious.<br><br>Page 18, lines 15-19. | Inappropriate subject for expert testimony. An expert cannot give an opinion as to his legal conclusion, i.e., an opinion on an ultimate issue of law. Speculative. FRE 704. |

| | |
|---|---|
| **31.** It is my opinion that Captain Swanigan had no reasonable grounds to believe that there was any threat to the safety or good order or discipline of either the aircraft or the passengers and that no offence had occurred nor was imminent when he decided to divert the plane to Reno and demand the removal and arrest of all nine members of the Ginena party. His decision to divert was arbitrary and capricious.<br><br>Page 18, lines 20-25. | Inappropriate subject for expert testimony. An expert cannot give an opinion as to his legal conclusion, i.e., an opinion on an ultimate issue of law. Speculative. FRE 704. |

Dated: January 23, 2006              MORRISON & FOERSTER LLP

By:      /s/ Don G. Rushing
         Don G. Rushing
         William V. O'Connor, Jr.

         Attorneys for Defendant
         ALASKA AIRLINES, INC.

# **ORDER**

THIS COURT, having considered the objections of Defendant Alaska Airlines to the Declaration of Captain Mark S. Swint, and after having heard the statements of counsel and being fully apprised in the premises, HEREBY ORDERS as follows as to each objection:

| Objection No. | Sustained/Overruled | Comments |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |
| 16. | | |
| 17. | | |
| 18. | | |
| 19. | | |
| 20. | | |
| 21. | | |

| Objection No. | Sustained/Overruled | Comments |
|---|---|---|
| 22. | | |
| 23. | | |
| 24. | | |
| 25. | | |
| 26. | | |
| 27. | | |
| 28. | | |
| 29. | | |
| 30. | | |
| 31. | | |

BY THE COURT:

Dated_____, 2006

_____
Honorable Robert C. Jones
District Judge