John F. McHugh (*pro hac vice*)
NY Bar No. 2083541
Attorney at Law
6 Water St.
New York, NY 10004
212-483-0875
jfmchughpc@aol.com

Gilbert Gaynor (*pro hac vice*)
Cal. Bar No. 107109
Attorney at Law
820 Arguello Road
Santa Barbara, CA 93103-1816
805-962-5842
gglawyer@earthlink.com

Allen Lichtenstein
Nevada Bar No. 3992
3315 Russell Road
Las Vegas, NV 89120
702-433-2666
Attorneys for Plaintiffs
allaw@lvcoxmail.com

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| REDA A. GINENA, NAHID I. GINENA, AMRE R. GINENA, SABRINA KOBERT, M. MAGDY H. RASIKH, M. SAMIR MANSOUR, AZZA EID, NAZMI M. NAZMI, and HEBA NAZMI,<br><br>                    Plaintiffs,<br><br>          v.<br><br>ALASKA AIRLINES, INC.<br><br>                    Defendant. | CV-S-04-1304-MMD-CWH<br><br>PLAINTIFFS' MOTION TO VACATE TRIAL DATE, SET NEW TRIAL DATE, AND MOVE PLACE OF TRIAL TO LAS VEGAS; DECLARATION OF JOHN F. MCHUGH; EXHIBIT; DECLARATION OF ALLEN LICHTENSTEIN |

1

## MOTION TO VACATE TRIAL DATE, SET NEW TRIAL DATE AND

## MOVE PLACE OF TRIAL TO LAS VEGAS

## I.  INTRODUCTION.

On March 19, 2012, Chief Judge Jones issues a minute order in this case, stating in pertinent part as follows:

"Calendar Call is scheduled for Monday, August 6, 2012 at 8:30 a.m. in Las Vegas Courtroom TBD. Jury Trial is scheduled for Monday, August 20, 2012 at 8:30 in Reno Courtroom 6 before Chief Judge Robert C. Jones."

Docket No. 225.

Thereafter, on June 1,2012,  Chief Judge Jones reassigned this case to the Hon. Miranda M. Du, United States District Judge.  Docket No. 237.  The minute order of Judge Jones transferring the action to Judge Du effectively removes this case from Judge Jones's trial calendar for August 20, 2012, or any other trial date.

Accordingly, plaintiffs respectfully move the Court to vacate the August 20 trial date and set a new trial date in this action.

Additionally, since this case was filed in Las Vegas, and was transferred to Reno not on the motion of any party or as required by any legal rule, but due to Judge Jones's decision to move his chambers from Las Vegas to Reno, and since center of gravity of the case and the convenience of the Court, parties and witnesses and counsel favor the place of original filing as the location of trial, plaintiffs respectfully request that this action be set for trial in Las Vegas.  Plaintiffs anticipate a four- to five-week jury trial.

## II.  NATURE OF THE CASE AND PROCEDURAL BACKGROUND.

Plaintiffs -- five Egyptian energy industry executives, three of their wives and the fiancée of a fourth – were traveling to Las Vegas for business on an international flight of defendant on September 29, 2003 when the airline, acting without cause and on a malicious, discriminatory basis, ejected all nine plaintiffs from the flight in Reno, and sought to have them arrested for alleged terrorist activities.  The Reno-Tahoe airport police promptly and correctly determined that no crime whatsoever had occurred, and so informed the captain.  As the Ninth Circuit stated in its first opinion in this case,

> "the story told by the flight crew at the time of the incident does not disclose any action on plaintiffs' part that could amount to a crime."

*Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 871 (9th Cir. 2010), *cert. denied,* 131 S.Ct. 2874 (2011).  But the captain refused to allow plaintiffs to continue on the flight.  With the assistance of police and the TSA, plaintiffs were able to travel to Las Vegas on a later America West flight.

Despite this, Alaska Airlines officials were angry that plaintiffs were not arrested and were allowed to continue to their destination.  On September 30, 2003, defendant made at least one false and malicious report to federal law enforcement agents, reporting plaintiffs to the Federal Air Marshal's office, an agency of the Joint Terrorism Task Force (JTTF).  This report was voluntary and not required by law.  Defendant also defamed plaintiffs repeatedly in e-mails and a newsletter.

On October 1, 2003 about a dozen agents from the Joint Terrorism Task Force, and half as many security personnel of the Bellagio Hotel in Las Vegas, descended on the

3

plaintiffs at that hotel, commanded that they come to the lobby, marched them through a portion of the lobby and down a public hallway to the hotel security office where they were interrogated.  Some of their rooms were also searched at this time. Mug shots of each plaintiff were taken.  No charges of any sort were ever filed.

Plaintiffs suffered substantial, serious injuries.  Plaintiffs timely filed their complaint in September 2004.  *Eid v. Alaska Airlines, Inc.*, 621 F.3d at 862.

Due to defendant's unexcused failure to timely comply with its discovery obligations under F.R.Civ.P. 34, Plaintiffs did not learn, until after the time to amend the complaint had expired, of defendant's post-flight communications to federal law enforcement, to another airline, and in company newsletters and e-mails, in which defendant had repeatedly defamed them with false accusations and imputations of terrorism and serious felonies.  Docket No. 138-2, at ¶ 2.  Promptly after learning of these defamations in November 2005, Plaintiffs filed their motion for leave to file a supplemental complaint containing seven additional claims for defamation on December 1, 2005.  Docket No. 56.

The district court denied plaintiffs' motion to file a supplemental complaint. The court also granted summary judgment to the defendant on plaintiffs' claim for delay under the Warsaw Convention, and dismissed plaintiffs' claim for defamation occurring at the airport.

The Ninth Circuit reversed the grant of summary judgment on the delay claim, and affirmed the denial of the motion to file a supplemental complaint and the dismissal of

the airport defamation claim. *Eid v. Alaska Airlines, Inc.*, 621 F.3d at 675.  But, the Circuit directed the district court to consider a motion to amend to add the new defamation claims.  *Id*.  The Supreme Court denied certiorari.

On remand, plaintiffs promptly moved to amend the complaint to add the seven defamation claims they could not have discovered before the deadline to amend.  The district court denied the motion to amend.  Docket No. 155.

Plaintiffs turned to the Ninth Circuit, requesting a writ of mandamus.  Plaintiffs argued that the court's order was erroneous, and to correct it on appeal after a full trial on the delay claim would unfairly require plaintiffs to have to bear undue burdens.  Eight of the nine plaintiffs are Egyptian citizens, and all reside outside the United States – four in Canada, and five in Egypt or Europe.

The Ninth Circuit agreed, and issued a writ of mandamus directing the court to file the Second Amended Complaint containing the additional defamation claims.  *Eid v. U.S. District Court*, Ninth Cir. No. 11-73129, Order of Feb. 23, 2012, Docket No. 215.  The Ninth Circuit found that the district court's "error is clear," and that "exceptional circumstances" warranted mandamus relief in this case. *Eid v. U.S. District Court*,  Order of Feb. 23, 2012, at 4,  Docket No. 215.

Thereafter, the second amended complaint, containing the claims originally set forth in the proposed supplemental complaint, was filed, and discovery commenced.  Docket No. 138-1.[1]   The parties engaged in mediation with a private mediator in New

---

[1]     The entry for the second amended complaint on the court's electronic docket on PACER, listed at Docket No.  226, incorrectly links, not to the second amended complaint, but to the original proposed supplemental complaint.

York City on June 8, 2012, but no settlement was reached.  Discovery is ongoing, and will close on Thursday, June 28, 2012.

**III.  THE COURT SHOULD SET THIS CASE FOR A FOUR- TO FIVE-WEEK TRIAL IN LAS VEGAS.**

As noted in the introduction, this case was filed in the Las Vegas courthouse of this Court in September 2004.  On March 19, 2012, Judge Jones set the case for calendar call in Las Vegas on  August 6, 2012, and for jury trial on August 20, 2012 in Reno.  As shown by the transcript of the March 19, 2012 status hearing – a copy of which is attached hereto as Exhibit A to the Declaration of John F. McHugh, Judge Jones's choice of a trial date of August 20, 2012 was based largely on the court's own trial calendar – which included a two-month murder trial set to begin on October 1, and a trailing one-month co-defendant's trial (Ex. A, 13-14) and secondarily to accommodate the vacation schedule of defense counsel (Ex. A, 15-17).   Judge Jones did "indicate a willingness to be flexible" as to the trial date.  Ex. A, at 17.  Judge Jones, who had moved his chambers to Reno, presided over the scheduling hearing in Reno:

> THE COURT: The last question, where are we going to do this trial? We've got
> out-of-town counsel, we've got out-of-town witnesses, both out-of-town to Las
> Vegas and Reno. I sit here, and it's an inconvenience to me to go to
> Las Vegas although, of course, I'm a Las Vegas judge.

Ex. A, at 20.  Considering, among other things, the weather, over plaintiffs' objections regarding inconvenience to witnesses and counsel, Judge Jones also selected Reno ("tentatively") as the place for trial.  Ex. A at 26.  Judge Jones did allow plaintiffs the opportunity to file objections to the place of trial by the end of June.  Ex. A, at 27.[2]

Since Judge Jones is no longer presiding in this case, it is appropriate that this Court set a new trial date, and related pretrial dates.   Plaintiffs respectfully request that, if the Court's schedule permits it, this case be set for a three-week jury trial in Las Vegas in October 2012.

First, plaintiffs respectfully submit that the place of trial should be the place of filing.  This is ordinarily the case in the District of Nevada.[3]  Moreover, in this instance trial in Las Vegas rather than Reno is appropriate in view of the convenience of the Court, witnesses, parties and counsel, and the overall center of gravity of this case.

First, none of the parties are located in Nevada.  The defendant is a corporation with its headquarters in Seattle, and its employees who will be witnesses are located in the Pacific Northwest.  All nine plaintiffs are foreign citizens who reside outside the

[2]        To the extent Judge Jones's order is still operative, plaintiffs respectfully request that this motion also be regarded as comprising plaintiffs' objections to the place of trial in Reno.

[3]        This Court's Local Rule IA 8-1 provides, in pertinent part:

(a) Civil actions shall be filed in the Clerk's office for the division of the Court in which the action allegedly arose. . . .
. . . .
(c) The Court may, in its discretion, direct that proceedings or trial take place in the division other than the division where filed.  Unless otherwise ordered, however, all filings shall be made and proceedings had in the division of the Court in which the case was originally filed

United States.   Here, the convenience of the parties favors Las Vegas over Reno, because Las Vegas, unlike Reno, has a major international airport, and other features that make travel to Las Vegas for an extended stay more economical and efficient for the parties, particularly plaintiffs, who would likely have to go through Las Vegas in any event to attend any proceedings in Reno.

Second, consideration of non-party witnesses favors Las Vegas as the place of trial.  There are two witnesses from the Reno area – Reno-Tahoe Airport Police officers Beharry and Ayers.  As noted in the Declaration of John F. McHugh, these witnesses are not expected to provide extensive or sharply contested testimony.   There will be at least three witnesses from the Las Vegas area, by contrast, and each is expected to provide extensive testimony.

Witness Kimberlie Shealy, a Las Vegas resident, was a passenger unaffiliated with plaintiffs' group who was seated in the twelve-seat first-class section.  She observed the interaction between Reda, Amre and Nahid Ginena and flight attendant Robin Duus at close range – from the best vantage point of any witness.   Ms. Shealy provided a declaration in opposition to defendant's ultimately unsuccessful summary judgment motion, and the Ninth Circuit found the declaration significant, quoting it at several points.   *Eid v. Alaska Airlines, Inc.*, 621 F.3d at 862-64, 870.

Defendant is expected to rely substantially on the account of coach-class passenger Marian Burford.  Ms. Burford is also a Las Vegas resident.

Plaintiffs will present at trial the expert testimony of Captain Mark S. Swint. Captain Swint -- a resident of Henderson, Nevada, in the Las Vegas area – will testify as

to the unreasonable and unprofessional conduct of defendant's pilot in connection with the events on Flight 694.  Just as with Ms. Shealy, the Ninth Circuit in its opinion found Captain Swint's declaration highly significant, quoting it several times.  *Eid v. Alaska Airlines, Inc.*, 621 F.3d at 869-72.

In addition, there may be other witnesses from the Las Vegas area who will be called to testify at trial.

The convenience of the Court, in that both the District Judge and the Magistrate Judge to whom this case is now assigned sit in Las Vegas, also plainly favors Las Vegas as the place of trial.

Moreover, the locations of counsel favor Las Vegas as the place of trial. Defendant is represented by counsel from Las Vegas and San Diego.  Plaintiffs are represented by counsel from Las Vegas, New York City, and Santa Barbara.  The interests of economy and efficiency for both sides would be plainly served by a trial in the place of filing, rather than in Reno, where no counsel are located.  Additionally, Mr. Lichtenstein, plaintiffs' co-counsel, will be teaching an evening class at the University of Nevada-Las Vegas this fall, and it is necessary for him to remain in the Las Vegas area to do so.  See Declaration of Allen Lichtenstein.

Finally, consideration of the center of gravity of this case favors Las Vegas as the place of trial.  While some of the events with which the trial will be concerned did occur at the Reno airport, other events happened in the air before the aircraft arrived in Reno, and later, crucial events happened in Las Vegas.  Las Vegas is where the plaintiffs suffered their injuries from the delay in violation of the Warsaw Convention, the place

where their business plans were disrupted due to defendant's conduct, and the place where they were marched through the lobby of their hotel, humiliated, embarrassed and traumatized.  Las Vegas is an entirely appropriate place for trial, clearly more so than Reno.

In setting this case for trial, plaintiffs suggest that that Court schedule a four- to five-week jury trial.  Prior to the commencement of the recent discovery period, the parties estimated a two-week trial.  Further discovery and case analysis have caused plaintiffs to revise their preliminary estimate.

As explained in the accompanying declaration of John F. McHugh, plaintiffs in their case-in-chief will present approximately 26-29 witnesses.  Most of these witnesses – including nine plaintiffs, five flight crew members, several experts, and at least one percipient witness – are expected to give testimony that will exceed one-half day each, including time for direct, cross and re-cross examination, and many are expected to give testimony that will last a court day or longer.

There may be considerable overlap between witnesses plaintiffs wish to call and those defendant will rely on.  But plaintiffs expect that defendant will call several witnesses in addition to those called by plaintiffs, including defendant's expert witness Captain Dan Ashby, and percipient witness Marian Burford.  Of course, court time must also be allotted for voir dire, opening statements, closing arguments, and instructing the jury.

1       Accordingly, plaintiffs now estimate a jury trial of four to five weeks, and

2   respectfully request that the Court vacate the current trial date and schedule a trial of that

3   length for Las Vegas.

5   DATE:  June 19, 2012          Respectfully submitted,

7                                  JOHN F. McHUGH
                               GILBERT GAYNOR

8                                  ALLEN LICHTENSTEIN

9                                  Attorney for Plaintiffs

11                                 /s/_____
                                 Gilbert Gaynor

### DECLARATION OF JOHN F. MCHUGH

I, John F. McHugh, declare as follows:

1.  I am an attorney admitted *pro hac vice* before this Court, and am co-counsel for the plaintiffs herein.  If called to testify in this matter I would testify competently as follows.

2.  As is set forth in the memorandum of law, this case originates with an incident on an aircraft which was flying from Vancouver, BC, to Las Vegas, NV on September 29, 2003.  The plaintiffs are eight Egyptian nationals and one Brazilian and all reside outside the United States.  Plaintiffs Nazmi Nazmi and Heba Bekhit Nazmi reside in Toronto, Canada; Amre Ginena and Sabrine Kobert Ginena reside in Milan, Italy;  M. Samir Mandour and Azza Eid reside in Cairo, Egypt; Reda Ginena and Nahid Ginena reside in Athens, Greece.  Plaintiff Nahid Ginena is being treated for cancer in Athens and in New York.  Thus, plaintiffs must travel between  2,200 miles and  7,000 miles to reach Las Vegas.  In all cases to reach Reno the plaintiffs would need to change planes. Those coming from Europe and Egypt would need to change planes three times.  To Las Vegas they can catch a non-stop in London - one change of aircraft.

3.  Of the non-party witnesses, two Reno-Tahoe Airport police officers will not take long as their testimony is largely limited to their police reports.  We do not anticipate them to take more than a half a day together.  As far as we know they are the only witnesses from Reno.

4.  We know of three witnesses from the Las Vegas area.  One from Henderson, Captain Swint, is an expert who will probably take more than one day.  The second,

Kimberly Shealey is a key witness who will take most of one day.  The third, Marian

Burford, is defendant's witness.

5.  We have at least one witness who will come from Canada and he will take an

hour.  Two other Canadian witnesses will also be short.  Again each can take a non-stop

from Vancouver to Las Vegas, so travel for these witnesses will be much easier than to

Reno.

6.  Dr. Hisham Issa is a witness who will testify as to plaintiffs' reputations in this

defamation case.  Dr. Issa will also travel from Cairo, Egypt, more than 7,000 miles.

Reno adds an additional change of aircraft.

7.  Defendant's witnesses come from Portland, OR or Seattle, WA, a direct flight

in each case to Las Vegas.

8.  The plaintiff's attorneys come from Las Vegas, New York and Santa Barbara,

California.  The defendant's attorneys also come from Las Vegas and San Diego,

California.

9.   When we discussed the trial date with Judge Jones in Reno, the considerations

which resulted in the August 20 trial date were a combination of the Court's calendar and

defendant's counsel's personal commitments.  We then believed this trial would take

approximately two weeks.  See Exhibit A, Transcript of March 19, 2012 hearing.

However, we have recently analyzed the witness testimony more carefully and find that a

two-three week trial is extremely optimistic.  Just the plaintiff's case will involve 26-29

witnesses, including the plaintiffs.  We estimate that seven witnesses will each take one

day.  Two will take between one and two days.   Ten will take between half a day and

three quarters of a day and five will take about two hours each or a bit more.  Therefore, the plaintiffs' direct case could run for about 19 trial days.   We assume the defendant will also need trial days.  In addition there are related  matters, such as jury selection and jury instructions, opening statements and summations.   Therefore, it would appear that the trial will take four weeks or more.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.  Executed this 18th day of June 2012 at New York, New York.

/s/ John F. McHugh

EXHIBIT A

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
2        BEFORE THE HONORABLE ROBERT C. JONES, CHIEF DISTRICT JUDGE
                           ---o0o---
3

4     REDA A. GINENA, et al.,          :
                                       :
5                  Plaintiffs,         :    No. 2:04-CV-1304-RCJ-CWH
                                       :
6           -vs-                       :    March 19, 2012
                                       :
7     ALASKA AIRLINES, INC.,           :    Reno, Nevada
                                       :
8                  Defendant.          :
                                       :
9     _____

10

11                  TRANSCRIPT OF STATUS CONFERENCE

12    APPEARANCES:

13    FOR THE PLAINTIFFS:       ALLEN LICHTENSTEIN
                                Attorney at Law
14                              Las Vegas, Nevada

15                              GILBERT GAYNOR
                                Attorney at Law
16                              Santa Barbara, California

17                              JOHN McHUGH
                                Attorney at Law
18                              New York, New York

19    FOR THE DEFENDANTS:       WILLIAM V. O'CONNOR
                                Attorney at Law
20                              San Diego, California

21

22    Reported by:             Margaret E. Griener, CCR #3, RDR
                                Official Reporter
23                              400 South Virginia Street
                                Reno, Nevada 89501
24                              (775)329-9980

25

2

1          RENO, NEVADA, MONDAY, MARCH 19, 2012, 10:17 A.M.

2                            ---o0o---

3

4          THE COURT:  Good morning.  Ginena versus Alaska

5    Airlines.  In the courtroom?  Apparently we're all here in the

6    courtroom.  Thank you so much.

7          Appearances, please.

8          MR. O'CONNOR:  Good morning, your Honor.

9    William O'Connor from Morrison & Foerster for Defendant Alaska

10   Airlines.

11         THE COURT:  Thank you.

12         MR. LICHTENSTEIN:  Allen Lichenstein for the

13   plaintiffs.

14         MR. McHUGH:  John McHugh for the plaintiff.

15         MR. GAYNOR:  And Gilbert Gaynor for plaintiffs,

16   your Honor.

17         THE COURT:  Thank you.  Nobody else is joining

18   us on this case by telephone, Alaska Airlines, by telephone?

19         THE CLERK:  No.

20         MR. O'CONNOR:  No.

21         THE COURT:  All right.  It seems to me that we

22   have two things to do.  We do have a current trial date set.

23   The first thing we need to do is discuss what causes of action

24   are now before the Court for trial and then do appropriate

25   scheduling.

1          As directed by the Ninth Circuit, I've got the

2     following causes of action, and, please, tell me where this is

3     different or limited.

4          The first is Article 19.  That's the delay issue.

5          The second is defamation, the filing of the criminal

6     complaint.  I believe that one has been adjudicated in the

7     prior decision, that is, that was affirmed based on

8     preemption.  We're talking about the filing of the criminal

9     complaint.

10          The third, defamation, announcement to passengers

11     onboard after plaintiff's debarkation.  Remember what they

12     affirmed was any defamation before debarkation.  That's valid

13     and that's for trial.  That's the third.

14          Fourth is defamation, communication to America West

15     Airlines, that would be after the debarkation, and therefore

16     that is for trial, for the jury.

17          Fifth is defamation, e-mail between defendants'

18     employees.  That is for trial.  Of course, there's a real

19     question here.  I think Judge Kosinski got it wrong, he said I

20     got it wrong.  But what he did say was that malice is still an

21     issue.

22          He recognized the inter-employee exception,

23     inter-corporate exception, you know, one mouth communicating

24     to another mouth in the same entity, but if there's malice, he

25     said, there's an exception under Nevada law.  We'll have to

4

1   see, of course, when we get to the jury instructions, but, of

2   course, we're going to go to trial on that.

3          So as far as I can tell, that's still an issue for

4   trial, e-mail between defendants' employees, but you're

5   apprised that you do have to establish the malice in relation

6   to those communications.

7          Number six is the same.

8          Number seven is the same.

9          Number eight is defamation, publication of chief

10   pilot newsletter to the defendants' employees, same potential

11   problem, but that I also see is for trial.

12          And number nine, republication of chief pilot

13   newsletter, same issue, same thing.

14          So that's what I see for trial.  Educate me to the

15   contrary, please.  Tell me if you disagree and if your

16   pretrial statement will be coming out that way and what else

17   do we need to do before we can hold trial if I'm right in so

18   listing.

19          MR. O'CONNOR:  If I may address those issues

20   first, your Honor.  William O'Connor for Alaska Airlines.

21          I think you've captured the scope of the claims that

22   are still in the case with a couple of clarifications.

23          The Court is correct that following the initial

24   Ninth Circuit decision the ruling on the postdiversion

25   announcement to the rest of the passengers on the aircraft was

1  remanded for trial.  Since that time we have filed a

2  stipulation to dismiss that claim.

3  THE COURT:  And that's number three.

4  MR. O'CONNOR:  Correct.  So that

5  postdisembarkation announcement is not -- will not be part of

6  the trial.

7  THE COURT:  What -- disembarkation,

8  postdisembarkation announcement to the passengers.

9  MR. O'CONNOR:  Correct.

10  THE COURT:  That is part of the trial, right?

11  That's number three.

12  MR. O'CONNOR:  It would be had we not stipulated

13  among the parties to dismiss that claim.

14  MR. LICHTENSTEIN:  We have consented to withdraw

15  that particular claim, your Honor.

16  THE COURT:  Okay.  So number three is off.  I

17  see.  I understand.

18  MR. O'CONNOR:  Right.

19  And the issue of the criminal complaint, while I

20  agree with the Court's reasoning, the plaintiffs will probably

21  disagree, and this is the criminal complaint.

22  You recall on the initial motions to dismiss back in

23  2005 now, we had an allegation that the report to the Reno

24  police was defamatory, and your Honor ruled --

25  THE COURT:  The filing of the complaint.

6

1           MR. O'CONNOR:  Correct, the filing of the

2    complaint at the airport.

3           THE COURT:  No other public disseminations, you

4    committed a criminal act, I'm not talking about that at all.

5    I'm talking about the filing of the complaint.

6           MR. O'CONNOR:  Correct, and that's what I

7    interpreted your Honor to mean by this first claim that you

8    mentioned.

9           You're correct that the Ninth Circuit upheld the

10   Court's ruling that that criminal complaint to the Reno Police

11   Department was preempted by the Warsaw Convention.

12           What we have now in the proposed amended complaint

13   is slightly different.  There is an allegation, and which we

14   dispute, but there is an allegation that following the report

15   to the Reno Police Department there were subsequent reports to

16   the FBI and the Joint Terrorism Task Force that would not be

17   included within the scope of the Warsaw Convention preemption

18   because --

19           THE COURT:  Was that included in the amended

20   complaint?

21           MR. O'CONNOR:  It is in the proposed amended

22   complaint, yes.  It is essentially what we've been calling

23   reports to federal officials, and so I think that that claim

24   is teed up for trial, and I see my friends on the other side

25   nodding their heads.

1            THE COURT:  Okay.

2            MR. O'CONNOR:  So with that clarification, I

3  think you've summarized all of the issues that are left.

4        For my client, we are --

5            THE COURT:  With all due respect, if the

6  complaints were made as a part of the normal course -- I mean,

7  pilots and stewardesses have an obligation to report all

8  incidences, right?

9        Are we talking about that kind of report, or are we

10  talking about, you know, general complaints about these

11  passengers going through the system?  Is that what we're

12  talking about?

13            MR. O'CONNOR:  That was our argument, your

14  Honor, for these claims.  When we opposed the motion to amend,

15  it was one part of the argument.  It was not the basis of the

16  Court's ruling.

17        But essentially we said by regulation, by federal

18  law, we're required to report the reasons for any diversion,

19  and that's what set into motion the communications with the

20  Joint Terrorism Task Force.

21            THE COURT:  So is that still on the table, the

22  communications to federal officials?  And, if so, I assume it

23  will be limited by the jury instructions.

24        If they have an obligation, a regulatory obligation

25  to report, you can't claim defamation.  If they're going

1   beyond their regulatory obligation to report and they're
2   saying kick these people out of the airline system altogether,
3   that sounds to me like an legitimate claim.
4              MR. McHUGH:  Your Honor, that second claim is
5   what we're talking about.
6              THE COURT:  Okay.
7              MR. McHUGH:  It was the official communication
8   to the FAA which was done, but there were also individual
9   claims filed by the stewardesses, flight attendants, and there
10  was also lobbying done by the company to get the FBI to pick
11  the case up and run with it after Reno police put it down.
12             THE COURT:  Okay.  So clearly we're talking
13  about something extra.
14             MR. McHUGH:  Right.
15             MR. O'CONNOR:  Yes, I mean, there is.  Our
16  position is what I explained.
17             THE COURT:  Sure.
18             MR. O'CONNOR:  And plaintiffs' is what Mr. Hugh
19  has explained.  There's a dispute on that issue and likely
20  needs to be resolved for trial.
21       But with that clarification, your Honor has
22  correctly summarized the issues that are left in the case.
23             THE COURT:  Okay.
24             MR. O'CONNOR:  We would like to see this case
25  concluded.  We would like to have a resolution.

1          THE COURT:  Well, the same here.  It's an old,

2    old case.

3          The Ninth Circuit has instructed me on how to hold

4    the trial, and it's time to hold the trial.  So is there

5    anything else you need?

6          MR. O'CONNOR:  Well, what we need is a trial

7    date.  I don't want to let go of the June trial date if we're

8    going to go back to the end of the line.

9          I think the instructions from my client to me are to

10   get this case resolved, and if we have to do it in a trial, we

11   should do it sooner than rather than later.

12          THE COURT:  Okay.  Please, plaintiffs, what else

13   do you need?  Sounds like we're all in accord on what's going

14   to the jury.

15          MR. LICHTENSTEIN:  Good morning, your Honor.

16          What's going to the jury we are in accord on.  The

17   time frame -- what do we need.  The complaint hasn't even been

18   officially filed yet.  That has to be done.  We need an

19   answer.  We need discovery.

20          THE COURT:  Do we need an answer and do you need

21   discovery?  Discovery has long since expired.

22          MR. LICHTENSTEIN:  Well, this is a second -- a

23   second amended complaint has now been told to be filed

24   so we're talking about --

25          THE COURT:  I denied the filing of it originally

1  because of what, futility, or summary judgment?  Why did I

2  deny --

3              MR. LICHTENSTEIN:  Motion to dismiss as I

4  recall.

5              MR. O'CONNOR:  Yes, there were two grounds, your

6  Honor, it was that --

7              THE COURT:  Well, what was the motion to dismiss

8  against, the first amended, the first complaint?  Yea or nay.

9  Just tell me yes or no, please.

10             MR. LICHTENSTEIN:  The second amended complaint,

11 yes.

12             THE COURT:  The one that's proposed now?

13             MR. O'CONNOR:  Yes.

14             THE COURT:  The one that's proposed now.  You've

15 litigated that dismissal.

16             MR. O'CONNOR:  Essentially, yes, you're correct.

17 We argued that the amendment would be futile, and those were

18 the grounds that your Honor --

19             THE COURT:  So I ruled futility, therefore you

20 can't file it.

21             MR. LICHTENSTEIN:  Correct.

22             THE COURT:  And the Circuit has told me no,

23 allow it.  So does it need to be served?

24             MR. O'CONNOR:  We're not going to require

25 service.  I think what we should do is deem the complaint

1   filed as of today.

2             We're not going to take very long to answer.  I

3   appreciate the plaintiffs think that we are required to answer

4   and we should be ordered to.  I'm not sure that's correct, but

5   we're going to answer in any event.

6             THE COURT:  Okay.  The filing is granted, will

7   be filed forthwith.  You'll have ten days to answer.

8             MR. O'CONNOR:  We'll answer tomorrow,

9   your Honor.

10            THE COURT:  Okay.  And why discovery?  What

11   discovery do you want or do you need?

12            MR. LICHTENSTEIN:  We need discovery because as

13   those particular claims -- and I don't remember the exact

14   numbers, but there are a whole bunch of them, were disallowed.

15   We were not able to do discovery concerning those particular

16   claims --

17            THE COURT:  I don't hear that, Mr. Lichenstein.

18   In other words, I really don't understand it.

19            MR. LICHTENSTEIN:  Well, all these defamation --

20            THE COURT:  You discovered defamation all over

21   the map.  Did he tell you -- did he tell you you can't ask

22   those questions because the judge is disallowing that claim?

23            MR. LICHTENSTEIN:  We were able to discover that

24   these claims existed.  We were not able to fully go through

25   the discovery to be able to --

1          THE COURT:  So he didn't deny any discovery, you

2     just simply haven't done it because these claims weren't of

3     record yet.

4          MR. LICHTENSTEIN:  Because we had no ability to

5     do these claims because the Court had --

6          THE COURT:  What do you need to do?

7          MR. LICHTENSTEIN:  We need to do -- again, some

8     of the things we have found out already.

9          THE COURT:  The fact or existence of the

10    communication, do you need to discover further on that?

11         MR. CONNOR:  I'm sorry?

12         THE COURT:  Two questions.  Do you need to

13    discover further on the fact of the communications, and,

14    number two, do you need to discover further on the damages

15    associated?

16         MR. LICHTENSTEIN:  I think probably -- I mean,

17    at this point I would say probably both because, again, we

18    have not fully gone through discovery.  We would want written

19    discovery, we want interrogatories, and there are some

20    depositions that --

21         THE COURT:  So you're talking about putting this

22    case off for another year or two because you're going to ask

23    who heard the communications, and you're going to depose those

24    people to see if there was damage?

25         MR. LICHTENSTEIN:  I don't think it will take

1  that long.  In terms of our discussion, we would -- we believe

2  that by beginning of October we would be ready to go to trial.

3  We're not going to be ready to go to trial in June.

4           THE COURT:  I can't let you do that.  I have a

5  prior scheduled mandatory criminal case, a two -- it's not

6  capital, but it is murder, and it's a two-month trial, and

7  then a trailing defendant, the fourth defendant, who is

8  separated for a one-month trial, and that's mandatory.  I have

9  to go forward with that.  It starts in -- it starts when,

10  Madam Clerk?

11           THE CLERK:  October 1st.

12           THE COURT:  October 1st.  So it's October,

13  November and as much of December as necessary to finish the

14  bifurcated trial.  So if I let you go later than October, I'm

15  really putting you into next year, to the spring of next year.

16  I don't think I can do that.

17      Can you -- if I give you a short 60-day discovery

18  period, can you conclude and be ready for trial by this

19  summer?

20           MR. LICHTENSTEIN:  I think that by -- I mean, it

21  would -- it would be a strain, but I think if we were able to

22  do -- September I think would work.

23           THE COURT:  How about August?  I'm negotiating

24  with you now.  How about August, because August is a very free

25  month, is it not?

1              Hold on just a minute.  September, August, the only

2    conflict I have is one week for the Circuit conference,

3    otherwise it's pretty open, or have you already scheduled

4    trials?

5              THE CLERK:  That's correct, your Honor.  One

6    week.  It's open.

7              THE COURT:  So how about September?  I've got a

8    one-week --

9              THE CLERK:  September at the end of the month.

10             THE COURT:  I've got a one-week conference in

11   September.

12             THE CLERK:  Correct.

13             THE COURT:  Have you scheduled any other trials

14   in September?

15             THE CLERK:  No.

16             THE COURT:  How long do you think this trial

17   will take, two weeks?

18             MR. LICHTENSTEIN:  Yeah, I think that would --

19             MR. O'CONNOR:  Or less.

20             MR. LICHTENSTEIN:  I always like to say less and

21   then it always turns out more so I -- certainly it wouldn't

22   take more than two weeks.

23             THE COURT:  Could I fit them in about the first

24   of September with assurance that we could conclude it?

25             MR. O'CONNOR:  Your Honor, could I raise

1    something with that date?

2                    THE COURT:  Yes, please.

3                    MR. O'CONNOR:  I have a prepaid vacation with my

4    wife that begins August 29.  We got married just last August,

5    and we didn't take a honeymoon because I had another trial, so

6    we're going to Ireland for three weeks.

7                    THE COURT:  Good for you.  Now, usually airlines

8    will take an excuse of prepaid that you're summonsed into

9    court and they'll move it for you.  You don't want to cancel

10   it.

11                   MR. O'CONNOR:  Well, I can't reschedule the

12   Notre Dame-Navy game that they're playing in Dublin on Labor

13   Day weekend.

14                   THE COURT:  I understand.

15                   MR. O'CONNOR:  But that is correct.  We could

16   make some --

17                   THE COURT:  When is the game?

18                   MR. O'CONNOR:  It's Labor Day weekend which

19   would be the 2nd, I believe.

20                   THE COURT:  Of September.

21                   MR. O'CONNOR:  Of September.

22                   THE COURT:  How long -- now, can you shift your

23   vacation so it starts a little earlier but still includes your

24   game?  You could try.

25                   MR. O'CONNOR:  I could try.  I'm dreading that

1   conversation, but I can certainly try.

2                   THE COURT:  Okay.  So let me negotiate with you

3   here.  How about the first of August, sometime around the

4   first of August, middle of August, so that we avoid his

5   problem and we get the trial going, and/or September 2nd which

6   has to be subject to his ability to move the dates, and if he

7   can't, then I'll insist on the first part of August.

8                   I'm giving you -- I'm reopening discovery for

9   March -- April and May.  I'm sure not anticipating further

10  dispositive motions.  I would not be very receptive to them on

11  either side's part.  So the only thing we're talking about is

12  discovery and preparing your joint pretrial order.

13                  MR. O'CONNOR:  Our preference, of course, is do

14  it sooner rather than later.  I have a conflict early

15  September I'd like to avoid.

16                  THE COURT:  What's the matter with August?

17                  MR. McHUGH:  I don't know that we can move that

18  fast.

19                  MR. LICHTENSTEIN:  I think that just in terms of

20  being prepared and making sure that we do justice to our

21  clients in terms of doing the discovery that we need to do,

22  that puts us a bit --

23                  THE COURT:  So you're concerned about

24  preparation time.

25                  MR. LICHTENSTEIN:  Yes.

1          THE COURT:  All right.  In order for me to do

2   justice to your clients I cannot set this trial back next

3   year, and so I am going to schedule it the fore part of

4   August.

5          I'm going to indicate a willingness to be flexible

6   if you tell me, but please don't come in on an automatic

7   signal that you're going to ask for continuance of the trial

8   because, you know, we have a problem with his travel schedule

9   and you have a problem with my travel schedule the last week

10  in September.  So if you squeeze us too much with a motion for

11  continuance giving us one week, I can't do that either.

12         So I'm going to schedule this the fore part of

13  August, ask you to make every effort to complete any discovery

14  necessary in April and May.

15         Your pretrial statement, then, is not due until July

16  which gives you a month and a half to prepare, prepare your

17  witnesses, prepare -- you've got a travel problem yourself for

18  your own clients, and that takes some fore planning, I

19  recognize that.  So I think that's what I'm going to do.

20         What are our potential dates, Madam Clerk?

21         THE CLERK:  For August?

22         THE COURT:  Yes.

23         THE CLERK:  We can start trial August 20th, that

24  would be right after -- the Monday right after the Ninth

25  Circuit, and hold calendar call the week before that.

1                    THE COURT:  You said August 20th?  Yes, that's a

2    problem then.  He's got a travel conflict -- oh, start the

3    trial August 20th?

4                    THE CLERK:  Yes.

5                    THE COURT:  There you go.  That gets you right

6    towards September.  And how much time does that give us?

7                    THE CLERK:  And you go -- when are you set to

8    go?

9                    MR. O'CONNOR:  I'm set to go --

10                   THE COURT:  The 29th.

11                   MR. O'CONNOR:  Yes, but if we start, I can go

12   two weeks, and I can get to Dublin for the game Saturday

13   morning, that would be the preference, and then I can do the

14   rest of the trip with my wife.

15                   THE COURT:  So you can potentially reschedule

16   preserving your date.

17                   MR. O'CONNOR:  Right.  I'm very concerned about

18   preserving the back half of that trip.  So if we're in court

19   for two weeks, and I leave on a red eye Friday night --

20                   THE COURT:  Well, it's not a recognized

21   religious holiday, but I understand some religious fervor

22   related thereto.

23                   MR. O'CONNOR:  Can I make one --

24                   THE COURT:  Let's kind of get this narrowed

25   down.  August 20th, Madam Clerk, the 22nd, the 22nd through

1    the 26th would be open.

2              This is a jury trial.

3              MR. LICHTENSTEIN:  That's correct.

4              THE COURT:  With all due respect, could I not

5    move you up to the 19th for jury selection.

6              MR. O'CONNOR:  I think that works.

7              THE COURT:  And then we've got a clear full five

8    days of testimony.

9              THE CLERK:  August?

10             THE COURT:  I'm talking about August.

11             THE CLERK:  August the 19th, 2012, is a Sunday.

12             THE COURT:  I'm in '11.

13             THE CLERK:  The 19th is a Sunday.

14             THE COURT:  August the 20th --

15             THE CLERK:  Is a Monday.

16             THE COURT:  -- is a Monday.  The 24th -- and

17   he's scheduled to leave Wednesday, the 29th, but you indicate

18   an ability to move that back, for example, to the weekend

19   which would give us two full weeks.

20             MR. O'CONNOR:  Correct.

21             THE COURT:  Okay.  That makes sense.  And

22   everybody is happy.  We're pretty well close to September 1st.

23             Okay.  Let's try for that.

24             MR. O'CONNOR:  Okay.

25             THE CLERK:  Calendar call will be Monday,

1    August 6th, 2012, at 8:30 a.m.  That will be set on a regular

2    Reno calendar call.

3                    THE COURT:  The last question, where are we

4    going to do this trial?  We've got out-of-town counsel, we've

5    got out-of-town witnesses, both out-of-town to Las Vegas and

6    Reno.  I sit here, and it's an inconvenience to me to go to

7    Las Vegas although, of course, I'm a Las Vegas judge.  So what

8    is your discussion on where we hold the trial?

9                    MR. LICHTENSTEIN:  For our clients in particular

10   who are coming from other places, Las Vegas clearly is an

11   easier place to get to, and I'll obviously give my -- since

12   I'm from Las Vegas, I'll give my own bias, but that shouldn't

13   play a part in it, but in terms of the witnesses --

14                   THE COURT:  No, that's important to me.  You're

15   from where?

16                   MR. O'CONNOR:  San Diego, your Honor.

17                   THE COURT:  And counsel are from?

18                   MR. McHUGH:  New York.

19                   MR. GAYNOR:  And Santa Barbara, your Honor.

20                   THE COURT:  And Santa Barbara and Las Vegas.

21   How about witnesses?  You're not sure yet?

22                   MR. McHUGH:  Two from Las Vegas.

23                   MR. LICHTENSTEIN:  Two from Las Vegas.

24                   THE COURT:  Two from Las Vegas.  That's it?

25                   MR. McHUGH:  Oh, we've got --

1           THE COURT:  You've got your clients, of course,

2    they're from Egypt.

3           MR. McHUGH:  We have several from Egypt.

4           MR. LICHTENSTEIN:  Elsewhere, also.

5           MR. McHUGH:  Two from Canada, two from Toronto.

6           THE COURT:  The damages claim, what witnesses do

7    you have and where are they from?

8           MR. McHUGH:  We have fact witnesses, we have an

9    expert witness from New York.

10          THE COURT:  So they're all out-of-town.

11       And how about you?

12          MR. O'CONNOR:  We have our personnel from

13   Seattle or Portland, our expert is from New Mexico.  So we're

14   not central to Reno or Las Vegas.

15       I think the concern would be for witnesses who would

16   be much more convenient to testify from the Las Vegas

17   courthouse, but I see that we do have the ability to call

18   them --

19          THE COURT:  No, I do not allow witnesses to

20   appear by tele-video.

21          MR. O'CONNOR:  Okay.

22          THE COURT:  Counsel I do but not witnesses.

23          MR. O'CONNOR:  Yeah, well --

24          THE COURT:  The jury has to look them in the

25   eye.

1          MR. O'CONNOR:  The Nevada witnesses, of course,

2    are in range for trial for subpoenas, but it would be much

3    more convenient for them to testify in Las Vegas.

4          THE COURT:  How many?

5          MR. O'CONNOR:  Two, I believe.

6          MR. McHUGH:  We've got one, we've got two, so we

7    have three --

8          MR. O'CONNOR:  And we may have to -- there's a

9    couple of Reno PD officers that would have the --

10         THE COURT:  Now, there is a different pool of

11   jurors, of course, there's the Las Vegas jurors -- it's not

12   Las Vegas, it's really -- there's three counties versus all of

13   the northern counties.  Of course, we can change that, too.

14   We can broaden the pool, or we can make it a total statewide

15   pool.

16         So we can correct for any problem there that you see

17   there's a concern for, but just simply as a place of holding

18   court, my preference would be to do it here.

19         MR. O'CONNOR:  We're certainly open to it, but I

20   think we would have to agree to it, or perhaps we could be

21   ordered, I don't know how that's handled.

22         THE COURT:  Yes, you can be ordered.  There is

23   no formal division.  We are one single district, and I'm a

24   Las Vegas judge as well as a Reno judge.  So I can order you,

25   but I don't want to order you if it's inconvenient, quote,

1    unquote, the legal term.

2                    MR. LICHTENSTEIN:  It is inconvenient.  Is it

3    impossible, no, but it certainly does create inconvenience,

4    again, because the flights and being able to get -- even

5    though Reno has a modern airport, it doesn't have quite the

6    volume and the scope that Las Vegas does.

7                    THE COURT:  Of course, that's one of the

8    delightful things and one of the reasons why I moved up here

9    is the Reno airport versus the Las Vegas airport.

10                   MR. LICHTENSTEIN:  But it doesn't help with

11   people coming in internationally.

12                   THE COURT:  No doubt that your clients will have

13   to initially fly in, especially if they're flying in from

14   overseas to Las Vegas which has a direct access, not Reno.

15                   MR. LICHTENSTEIN:  That's one of the big

16   problems.

17                   THE COURT:  And they would have to take a second

18   flight.

19          At this juncture I'm going to tentatively order that

20   it occur here.  If you think that's unfair vis-a-vis the jury

21   pool, please tell me and we'll correct for that.  In other

22   words, we'll do whatever you suggest.

23          I won't make it a strictly southern -- informal

24   southern division pool, but I will make it a statewide pool if

25   you think that's important on either side's objection.

1          But basically what you're telling me is other than a

2    couple of witnesses which are minor percentagewise relative to

3    all of the other witnesses and the clients, that everybody is

4    from out of town, including all of the witnesses.

5          So with due respect, I think I would like to order

6    it for Reno with adjustments as you feel necessary for the

7    jury pool.

8              MR. GAYNOR:  Your Honor, may I just make one

9    further point?  I think that in terms of the preponderance of

10   the location of where --

11             THE COURT:  Right.

12             MR. GAYNOR:  For example, Ms. Sheeley, is -- I

13   think both sides probably agree -- going to be a major witness

14   in this trial.  She is a Las Vegas resident.

15             THE COURT:  She's a stewardess or --

16             MR. GAYNOR:  No, she is a first-class passenger

17   on the flight so she saw everything.

18             THE COURT:  Oh, okay.  Go ahead.

19             MR. GAYNOR:  In terms of the damages for the

20   defamation, your Honor, our clients were marched through the

21   lobby of the Bellagio Hotel in Las Vegas by numerous people,

22   by numerous law enforcement officers.  This was deeply

23   humiliating to them.  It's in Las Vegas.

24             So in terms of both liability and damages, critical

25   witnesses and critical events took place there, and we feel

1    that the focus of the action --

2              THE COURT:  You have one witness from that scene

3    or several witnesses from that scene.

4              MR. O'CONNOR:  There's no witnesses from that

5    scene other than the plaintiffs themselves.

6              THE COURT:  Okay.

7              MR. GAYNOR:  But we feel that the whole focus,

8    the location of this action really should be in Las Vegas

9    because that's --

10             THE COURT:  But that's not true.  The damage

11   occurred in the delay which all occurred and the -- some of

12   the initial defamations in Reno at the Reno airport, second on

13   the airplane between Reno and Las Vegas.

14             And then in Las Vegas, how was it that the

15   plaintiffs were traipsed through the hotel?

16             MR. GAYNOR:  When Alaska Airlines -- this is our

17   theory of the case, obviously, the defense may disagree, but

18   in our view of the case, when Alaska Airlines was unsuccessful

19   in getting our clients arrested at the airport, they continued

20   to make complaints to federal authorities and that resulted --

21             THE COURT:  Were they arrested in Las Vegas?

22             MR. GAYNOR:  They were not arrested, they were

23   taken into police -- or, excuse me, law enforcement -- they

24   were interviewed by law enforcement.  They were taken into --

25   I'm not sure arrest is the right word, but they were --

1          THE COURT:  Well, that escaped my attention.

2          MR. GAYNOR:  Yes.  They were detained, they were

3     interviewed, their mug shots were taken --

4          THE COURT:  By hotel security or Metro?

5          MR. GAYNOR:  No, by federal officials.  Their

6     hotel rooms in Las Vegas were searched, and the locus of much

7     of their emotional distress and humiliation from this actually

8     occurred in Las Vegas at the behest of the defendant's

9     intervention with the FBI.

10          THE COURT:  How are you going to put that on to

11     the jury, what witnesses?

12          MR. GAYNOR:  It will be through the plaintiffs

13     largely, but that will be the major --

14          THE COURT:  Why don't you have hotel witnesses?

15          MR. McHUGH:  We will probably call the director

16     of security of the hotel who is the one who orchestrated

17     this --

18          THE COURT:  I would think so.

19          MR. McHUGH:  And had the rooms available --

20          THE COURT:  That would be an additional

21     Las Vegas witness.

22          MR. McHUGH:  That would be additional, and, of

23     course, there were several hotel employees involved.

24          THE COURT:  Okay.  Well, I'm going to leave it

25     as it is tentatively for Reno.  You do your discovery.  You

1    tell me at the end of discovery, no later than June, please,

2    by way of motion or status hearing, that you really think it

3    should be in Las Vegas and here's why, okay?

4                    MR. O'CONNOR:  I had one final point.

5                    THE COURT:  One more.

6                    MR. O'CONNOR:  Now that we've settled the issue

7    of what the claims are in the case --

8                    THE COURT:  Also, one additional reason is heat,

9    of course.  Of course, I was born in Las Vegas so it doesn't

10   affect me very much, and it won't affect the clients if

11   they're from Egypt, but it may affect people from other parts.

12           Go ahead.

13                    MR. O'CONNOR:  We know -- both sides know what

14   the case is going to be about now, we've resolved the many

15   layers of appeal.  We've been up to the Supreme Court on a

16   writ and back.

17           What we've never done over all these years of

18   litigating the case is being able to sit down across the table

19   to see if we could resolve that.

20                    THE COURT:  By the way, did you file a writ?

21                    MR. O'CONNOR:  We did.

22                    THE COURT:  A request for a writ?

23                    MR. O'CONNOR:  We did.

24                    THE COURT:  It was just denied.

25                    MR. O'CONNOR:  It was just denied, which was a

1    surprise because we had -- I think there were about six or

2    seven amicus involved, and all the legal blogs picked up on

3    the case and thought it was going to be accepted.

4                    THE COURT:  And, of course, they never give a

5    reason, so you just don't know.

6                    MR. O'CONNOR:  We don't know, but we thought we

7    had a shot.  But, in any event --

8                    THE COURT:  So they may be saying we'll take it

9    later or we don't intend ever to take this case.

10                   MR. O'CONNOR:  We don't know.  And the problem

11   is summary judgment orders are tougher to get the Supreme

12   Court to review.

13           But, in any case, we feel -- my client feels that

14   another way to resolve this case is to talk about the issues

15   with the other side, and we've been unsuccessful in

16   precipitating that, and so a court-ordered mediation while

17   we're heading for trial seems like a very good idea to me and

18   my client.

19                   MR. LICHTENSTEIN:  While we are not opposed to

20   that at all, I think it's premature at this point.  After

21   discovery, after we kind of know where our case is in terms of

22   what we discover during that particular period, we may very

23   well be willing to do so, but at this particular point --

24                   THE COURT:  I'll order it -- as a matter of

25   course, I always order it if either side requests it, but, of

1  course, the scheduling by the magistrate judge won't be able

2  to occur until probably June, certainly the end of May.

3  They're booked pretty full.

4        So I'll just simply mandate that you or both of you

5  contact the magistrate judge for scheduling.  Make sure they

6  understand that the mediation can't really occur until the end

7  of May or first part of June which I'm sure they'll be

8  delighted to hear, and they'll schedule you a mandatory

9  mediation session.

10        You're obligated to come, at least somebody -- it

11  doesn't have to be your clients, but there has to be somebody

12  who has authority to settle from each side, and with the

13  normal requirements, and you'll direct that inquiry first to

14  the magistrate judge assigned who is --

15              MR. O'CONNOR:  Hoffman, your Honor.

16              THE COURT:  Pardon?

17              MR. O'CONNOR:  Judge Hoffman.

18              THE COURT:  Judge Hoffman.  Terrific.

19              MR. LICHTENSTEIN:  Magistrate Judge Hoffman.

20        And we would request -- I guess we'll make that

21  request to Magistrate Judge Hoffman that it be pushed back to

22  give us as much time as possible to prepare for that.

23              THE COURT:  Yes, he'll select a date at your

24  convenience.  So if your clients can be there, of course,

25  that's terrific, that's better, it will be more meaningful.

30

1    If they can't, then at least somebody with authority to settle

2    has to be there.

3             Okay?  All right.

4                  MR. O'CONNOR:  Thank you, your Honor.

5                  MR. McHUGH:  Thank you, your Honor.

6                  THE COURT:  Thank you so much.  Thank you for

7    coming.

8                              -o0o-

9

10            I certify that the foregoing is a correct
              transcript from the record of proceedings
11            in the above-entitled matter.

12            /s/Margaret E. Griener          03/29/2012
              Margaret E. Griener, CCR #3, RDR
13            Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25

'

**'11** [1] - 19:12

**/**

**/s/Margaret** [1] - 30:12

**0**

**03/29/2012** [1] - 30:12

**1**

**10:17** [1] - 2:1
**19** [3] - 1:6, 2:1, 3:4
**19th** [3] - 19:5, 19:11, 19:13
**1st** [3] - 13:11, 13:12, 19:22

**2**

**2005** [1] - 5:23
**2012** [4] - 1:6, 2:1, 19:11, 20:1
**20th** [5] - 17:23, 18:1, 18:3, 18:25, 19:14
**22nd** [2] - 18:25
**24th** [1] - 19:16
**26th** [1] - 19:1
**29** [1] - 15:4
**29th** [2] - 18:10, 19:17
**2:04-CV-1304-RCJ-CWH** [1] - 1:5
**2nd** [2] - 15:19, 16:5

**3**

**3** [2] - 1:22, 30:12

**4**

**400** [1] - 1:23

**6**

**60-day** [1] - 13:17
**6th** [1] - 20:1

**7**

**775)329-9980** [1] - 1:24

**8**

**89501** [1] - 1:23
**8:30** [1] - 20:1

**A**

**A.M** [1] - 2:1
**a.m** [1] - 20:1
**ability** [4] - 12:4, 16:6, 19:18, 21:17
**able** [8] - 11:15, 11:23, 11:24, 11:25, 13:21, 23:4, 27:18, 29:1
**above-entitled** [1] - 30:11
**accepted** [1] - 28:3
**access** [1] - 23:14
**accord** [2] - 9:13, 9:16
**act** [1] - 6:4
**action** [4] - 2:23, 3:2, 25:1, 25:8
**additional** [3] - 26:20, 26:22, 27:8
**address** [1] - 4:19
**adjudicated** [1] - 3:6
**adjustments** [1] - 24:6
**affect** [3] - 27:10, 27:11
**affirmed** [2] - 3:7, 3:12
**agree** [3] - 5:20, 22:20, 24:13
**ahead** [2] - 24:18, 27:12
**aircraft** [1] - 4:25
**airline** [1] - 8:2
**airlines** [1] - 15:7
**AIRLINES** [1] - 1:7
**Airlines** [7] - 2:5, 2:10, 2:18, 3:15, 4:20, 25:16, 25:18
**airplane** [1] - 25:13
**airport** [6] - 6:2, 23:5, 23:9, 25:12, 25:19
**al** [1] - 1:4
**ALASKA** [1] - 1:7
**Alaska** [6] - 2:4, 2:9, 2:18, 4:20, 25:16, 25:18

**allegation** [3] - 5:23, 6:13, 6:14
**Allen** [1] - 2:12
**ALLEN** [1] - 1:13
**allow** [2] - 10:23, 21:19
**altogether** [1] - 8:2
**amend** [1] - 7:14
**amended** [6] - 6:12, 6:19, 6:21, 9:23, 10:8, 10:10
**amendment** [1] - 10:17
**America** [1] - 3:14
**amicus** [1] - 28:2
**announcement** [4] - 3:10, 4:25, 5:5, 5:8
**answer** [7] - 9:19, 9:20, 11:2, 11:3, 11:5, 11:7, 11:8
**anticipating** [1] - 16:9
**appeal** [1] - 27:15
**appear** [1] - 21:20
**appearances** [1] - 2:7
**APPEARANCES** [1] - 1:12
**appreciate** [1] - 11:3
**apprised** [1] - 4:5
**appropriate** [1] - 2:24
**April** [2] - 16:9, 17:14
**argued** [1] - 10:17
**argument** [2] - 7:13, 7:15
**arrest** [1] - 25:25
**arrested** [3] - 25:19, 25:21, 25:22
**Article** [1] - 3:4
**assigned** [1] - 29:14
**associated** [1] - 12:15
**assume** [1] - 7:22
**assurance** [1] - 14:24
**attendants** [1] - 8:9
**attention** [1] - 26:1
**Attorney** [4] - 1:13, 1:15, 1:17, 1:19
**August** [23] - 13:23, 13:24, 14:1, 15:4, 16:3, 16:4, 16:7, 16:16, 17:4, 17:13, 17:21, 17:23, 18:1, 18:3, 18:25, 19:9, 19:10, 19:11, 19:14, 20:1
**authorities** [1] - 25:20
**authority** [2] - 29:12,

30:1
**automatic** [1] - 17:6
**available** [1] - 26:19
**avoid** [2] - 16:4, 16:15

**B**

**Barbara** [3] - 1:16, 20:19, 20:20
**based** [1] - 3:7
**basis** [1] - 7:15
**BEFORE** [1] - 1:2
**beginning** [1] - 13:2
**begins** [1] - 15:4
**behest** [1] - 26:8
**Bellagio** [1] - 24:21
**better** [1] - 29:25
**between** [3] - 3:17, 4:4, 25:13
**beyond** [1] - 8:1
**bias** [1] - 20:12
**bifurcated** [1] - 13:14
**big** [1] - 23:15
**bit** [1] - 16:22
**blogs** [1] - 28:2
**booked** [1] - 29:3
**born** [1] - 27:9
**broaden** [2] - 22:14
**bunch** [1] - 11:14

**C**

**calendar** [3] - 17:25, 19:25, 20:2
**California** [2] - 1:16, 1:20
**Canada** [1] - 21:5
**cancel** [1] - 15:9
**cannot** [1] - 17:2
**capital** [1] - 13:6
**captured** [1] - 4:21
**case** [19] - 2:18, 4:22, 8:11, 8:22, 8:24, 9:2, 9:10, 12:22, 13:5, 25:17, 25:18, 27:7, 27:14, 27:18, 28:3, 28:9, 28:13, 28:14, 28:21
**causes** [2] - 2:23, 3:2
**central** [1] - 21:14
**certainly** [5] - 14:21, 16:1, 22:19, 23:3, 29:2
**certify** [1] - 30:10
**change** [1] - 22:13
**chief** [2] - 4:9, 4:12
**CHIEF** [1] - 1:2
**Circuit** [7] - 3:1,

4:24, 6:9, 9:3, 10:22, 14:2, 17:25
**claim** [10] - 5:2, 5:13, 5:15, 6:7, 6:23, 7:25, 8:3, 8:4, 11:22, 21:6
**claims** [9] - 4:21, 7:14, 8:9, 11:13, 11:16, 11:24, 12:2, 12:5, 27:7
**clarification** [2] - 7:2, 8:21
**clarifications** [1] - 4:22
**class** [1] - 24:16
**clear** [1] - 19:7
**clearly** [2] - 8:12, 20:10
**Clerk** [3] - 13:10, 17:20, 18:25
**client** [4] - 7:4, 9:9, 28:13, 28:18
**clients** [12] - 16:21, 17:2, 17:18, 20:9, 21:1, 23:12, 24:3, 24:20, 25:19, 27:10, 29:11, 29:24
**close** [1] - 19:22
**coming** [4] - 4:16, 20:10, 23:11, 30:7
**committed** [1] - 6:4
**communicating** [1] - 3:23
**communication** [3] - 3:14, 8:7, 12:10
**communications** [5] - 4:6, 7:19, 7:22, 12:13, 12:23
**company** [1] - 8:10
**complaint** [16] - 3:6, 3:9, 5:19, 5:21, 5:25, 6:2, 6:5, 6:10, 6:12, 6:20, 6:22, 9:17, 9:23, 10:8, 10:10, 10:25
**complaints** [3] - 7:6, 7:10, 25:20
**complete** [1] - 17:13
**concern** [2] - 21:15, 22:17
**concerned** [2] - 16:23, 18:17
**concerning** [1] - 11:15
**conclude** [1] - 13:18, 14:24
**concluded** [1] - 8:25
**CONFERENCE** [1] - 1:11
**conference** [2] - 14:2, 14:10
**conflict** [3] - 14:2, 16:14, 18:2

CONNOR [1] - 12:11
consented [1] - 5:14
contact [1] - 29:5
continuance [2] -
17:7, 17:11
continued [1] - 25:19
contrary [1] - 4:15
convenience [1] -
29:24
convenient [2] -
21:16, 22:3
Convention [2] -
6:11, 6:17
conversation [1] -
16:1
corporate [1] - 3:23
Correct [1] - 10:21
correct [16] - 4:23,
5:4, 5:9, 6:1, 6:6, 6:9,
10:16, 11:4, 14:5,
14:12, 15:15, 19:3,
19:20, 22:16, 23:21,
30:10
correctly [1] - 8:22
counsel [3] - 20:4,
20:17, 21:22
counties [2] - 22:12,
22:13
couple [3] - 4:22,
22:9, 24:2
course [18] - 3:18,
4:1, 4:2, 7:6, 16:13,
20:7, 21:1, 22:1,
22:11, 22:13, 23:7,
26:23, 27:9, 28:4,
28:25, 29:1, 29:24
Court [5] - 2:24,
4:23, 12:5, 27:15,
28:12
court [4] - 15:9,
18:18, 22:18, 28:16
Court's [5] - 5:20,
6:10, 7:16
court-ordered [1] -
28:16
courthouse [1] -
21:17
courtroom [2] - 2:5,
2:6
create [1] - 23:3
criminal [7] - 3:5,
3:8, 5:19, 5:21, 6:4,
6:10, 13:5
critical [2] - 24:24,
24:25
current [1] - 2:22

**D**

damage [2] - 12:24,
25:10

damages [4] - 12:14,
21:6, 24:19, 24:24
Dame [1] - 15:12
Dame-Navy [1] -
15:12
date [6] - 2:22, 9:7,
15:1, 18:16, 29:23
dates [2] - 16:6,
17:20
days [2] - 11:7, 19:8
debarkation [3] -
3:11, 3:12, 3:15
December [1] -
13:13
decision [2] - 3:7,
4:24
deem [1] - 10:25
deeply [1] - 24:22
defamation [10] -
3:5, 3:10, 3:12, 3:14,
3:17, 4:9, 7:25, 11:19,
11:20, 24:20
defamations [1] -
25:12
defamatory [1] - 5:24
defendant [2] - 13:7
Defendant [2] - 1:8,
2:9
defendant's [1] -
26:8
DEFENDANTS [1] -
1:19
defendants' [3] -
3:17, 4:4, 4:10
defense [1] - 25:17
delay [2] - 3:4, 25:11
delighted [1] - 29:8
delightful [1] - 23:8
denied [3] - 9:25,
27:24, 27:25
deny [2] - 10:2, 12:1
Department [2] -
6:11, 6:15
depose [1] - 12:23
depositions [1] -
12:20
detained [1] - 26:2
Diego [2] - 1:20,
20:16
different [3] - 3:3,
6:13, 22:10
direct [2] - 23:14,
29:13
directed [1] - 3:1
director [1] - 26:15
disagree [3] - 4:15,
5:21, 25:17
disallowed [1] -
11:14
disallowing [1] -
11:22

discover [5] - 11:23,
12:10, 12:13, 12:14,
28:22
discovered [1] -
11:20
discovery [19] - 9:19,
9:21, 11:10, 11:11,
11:12, 11:15, 11:25,
12:1, 12:18, 12:19,
13:17, 16:8, 16:12,
16:21, 17:13, 26:25,
27:1, 28:21
discuss [1] - 2:23
discussion [2] -
13:1, 20:8
disembarkation [1] -
5:7
dismiss [5] - 5:2,
5:13, 5:22, 10:3, 10:7
dismissal [1] - 10:15
dispositive [1] -
16:10
dispute [2] - 6:14,
8:19
disseminations [1] -
6:3
distress [1] - 26:7
district [1] - 22:23
diversion [1] - 7:18
division [2] - 22:23,
23:24
done [5] - 8:8, 8:10,
9:18, 12:2, 27:17
doubt [1] - 23:12
down [3] - 8:11,
18:25, 27:18
dreading [1] - 15:25
Dublin [2] - 15:12,
18:12
due [4] - 7:5, 17:15,
19:4, 24:5
during [1] - 28:22

**E**

e-mail [3] - 3:17, 4:4
early [1] - 16:14
easier [1] - 20:11
educate [1] - 4:14
effort [1] - 17:13
Egypt [3] - 21:2,
21:3, 27:11
eight [1] - 4:9
either [4] - 16:11,
17:11, 23:25, 28:25
elsewhere [1] - 21:4
emotional [1] - 26:7
employee [1] - 3:22
employees [4] -
3:18, 4:4, 4:10, 26:23

end [5] - 9:8, 14:9,
27:1, 29:2, 29:6
enforcement [3] -
24:22, 25:23, 25:24
entitled [1] - 30:11
entity [1] - 3:24
escaped [1] - 26:1
especially [2] - 23:13
essentially [3] -
6:22, 7:17, 10:16
establish [1] - 4:5
et [1] - 1:4
event [2] - 11:5, 28:7
events [1] - 24:25
exact [1] - 11:13
example [2] - 19:18,
24:12
exception [3] - 3:22,
3:23, 3:25
excuse [2] - 15:8,
25:23
existed [1] - 11:24
existence [1] - 12:9
expert [2] - 21:9,
21:13
expired [1] - 9:21
explained [2] - 8:16,
8:19
extra [1] - 8:13
eye [2] - 18:19, 21:25

**F**

FAA [1] - 8:8
fact [3] - 12:9, 12:13,
21:8
far [1] - 4:3
fast [1] - 16:18
FBI [3] - 6:16, 8:10,
26:9
federal [6] - 6:23,
7:17, 7:22, 25:20,
26:5
fervor [1] - 18:21
fifth [1] - 3:17
file [2] - 10:20, 27:20
filed [6] - 5:1, 8:9,
9:18, 9:23, 11:1, 11:7
filing [3] - 3:5, 3:8,
5:25, 6:1, 6:5, 9:25,
11:6
final [1] - 27:4
finish [1] - 13:13
first [13] - 2:23, 3:4,
4:20, 6:7, 10:8, 14:23,
16:3, 16:4, 16:7,
24:16, 29:7, 29:13
first-class [1] - 24:16
fit [1] - 14:23
five [1] - 19:7

flexible [1] - 17:5
flight [3] - 8:9, 23:18,
24:17
flights [1] - 23:4
fly [1] - 23:13
flying [1] - 23:13
focus [2] - 25:1, 25:7
Foerster [1] - 2:9
following [3] - 3:2,
4:23, 6:14
FOR [2] - 1:13, 1:19
Force [2] - 6:16, 7:20
fore [3] - 17:3, 17:12,
17:18
foregoing [1] - 30:10
formal [1] - 22:23
forthwith [1] - 11:7
forward [1] - 13:9
fourth [2] - 3:14,
13:7
frame [1] - 9:17
free [1] - 13:24
Friday [1] - 18:19
friends [1] - 6:24
full [3] - 19:7, 19:19,
29:3
fully [2] - 11:24,
12:18
futile [1] - 10:17
futility [2] - 10:1,
10:19

**G**

game [4] - 15:12,
15:17, 15:24, 18:12
Gaynor [2] - 2:15
GAYNOR [13] - 1:15,
2:15, 20:19, 24:8,
24:12, 24:16, 24:19,
25:7, 25:16, 25:22,
26:2, 26:5, 26:12
general [1] - 7:10
Gilbert [2] - 2:15
GILBERT [1] - 1:15
GINENA [1] - 1:4
Ginena [1] - 2:4
granted [1] - 11:6
grounds [2] - 10:5,
10:18
guess [1] - 29:20

**H**

half [2] - 17:16,
18:18
handled [1] - 22:21
happy [1] - 19:22
heading [1] - 28:17
heads [1] - 6:25

hear [2] - 11:17, 29:8
heard [1] - 12:23
hearing [1] - 27:2
heat [1] - 27:8
help [1] - 23:10
Hoffman [5] - 29:15, 29:17, 29:18, 29:19, 29:21
hold [6] - 4:17, 9:3, 9:4, 14:1, 17:25, 20:8
holding [1] - 22:17
holiday [1] - 18:21
honeymoon [1] - 15:5
Honor [22] - 2:8, 2:16, 4:20, 5:15, 5:24, 6:7, 7:14, 8:4, 8:21, 9:15, 10:6, 10:18, 11:9, 14:5, 14:25, 20:16, 20:19, 24:8, 24:20, 29:15, 30:4, 30:5
Hotel [1] - 24:21
hotel [6] - 25:15, 26:4, 26:6, 26:14, 26:16, 26:23
Hugh [1] - 8:18
humiliating [1] - 24:23
humiliation [1] - 26:7

**I**

idea [1] - 28:17
important [2] - 20:14, 23:25
impossible [1] - 23:3
INC [1] - 1:7
incidences [1] - 7:8
included [2] - 6:17, 6:19
includes [1] - 15:23
including [1] - 24:4
inconvenience [2] - 20:6, 23:3
inconvenient [2] - 22:25, 23:2
indicate [2] - 17:5, 19:17
individual [1] - 8:8
informal [1] - 23:23
initial [3] - 4:23, 5:22, 25:12
inquiry [1] - 29:13
insist [1] - 16:7
instructed [1] - 9:3
instructions [3] - 4:1, 7:23, 9:9
intend [1] - 28:9
inter [2] - 3:22, 3:23

inter-corporate [1] - 3:23
inter-employee [1] - 3:22
internationally [1] - 23:11
interpreted [1] - 6:7
interrogatories [1] - 12:19
intervention [1] - 26:9
interviewed [2] - 25:24, 26:3
involved [2] - 26:23, 28:2
Ireland [1] - 15:6
issue [7] - 3:4, 3:21, 4:3, 4:13, 5:19, 8:19, 27:6
issues [4] - 4:19, 7:3, 8:22, 28:14

**J**

JOHN [1] - 1:17
John [1] - 2:14
joining [1] - 2:17
Joint [2] - 6:16, 7:20
joint [1] - 16:12
JONES [1] - 1:2
Judge [4] - 3:19, 29:18, 29:19, 29:21
judge [8] - 11:22, 20:7, 22:24, 29:1, 29:5, 29:14, 29:17
judgment [2] - 10:1, 28:11
July [1] - 17:15
juncture [1] - 23:19
June [5] - 9:7, 13:3, 27:1, 29:2, 29:7
jurors [2] - 22:11
jury [3] - 3:1, 4:1, 7:23, 9:14, 9:16, 19:2, 19:5, 21:24, 23:20, 24:7, 26:11
justice [2] - 16:20, 17:2

**K**

kick [1] - 8:2
kind [3] - 7:9, 18:24, 28:21
Kosinski [1] - 3:19

**L**

Labor [2] - 15:12,

15:18
largely [1] - 26:13
Las [31] - 1:14, 20:5, 20:7, 20:10, 20:12, 20:20, 20:22, 20:23, 20:24, 21:14, 21:16, 22:3, 22:11, 22:12, 22:24, 23:6, 23:9, 23:14, 24:14, 24:21, 24:23, 25:8, 25:13, 25:14, 25:21, 26:6, 26:8, 26:21, 27:3, 27:9
last [3] - 15:4, 17:9, 20:3
law [5] - 3:25, 7:18, 24:22, 25:23, 25:24
Law [4] - 1:13, 1:15, 1:17, 1:19
layers [1] - 27:15
least [2] - 29:10, 30:1
leave [2] - 18:19, 19:17, 26:24
left [2] - 7:3, 8:22
legal [2] - 23:1, 28:2
legitimate [1] - 8:3
less [2] - 14:19, 14:20
liability [1] - 24:24
Lichenstein [2] - 2:12, 11:17
LICHTENSTEIN [29] - 1:13, 2:12, 5:14, 9:15, 9:22, 10:3, 10:10, 10:21, 11:12, 11:19, 11:23, 12:4, 12:7, 12:16, 12:25, 13:20, 14:18, 14:20, 16:19, 16:25, 19:3, 20:9, 20:23, 21:4, 23:2, 23:10, 23:15, 28:19, 29:19
likely [1] - 8:19
limited [3] - 3:3, 7:23
line [1] - 9:8
listing [1] - 4:18
litigated [1] - 10:15
litigating [1] - 27:18
lobby [1] - 24:21
lobbying [1] - 8:10
location [2] - 24:10, 25:8
locus [1] - 26:6
look [1] - 21:24

**M**

Madam [3] - 13:10, 17:20, 18:25
Magistrate [2] - 29:19, 29:21

magistrate [3] - 29:1, 29:5, 29:14
mail [1] - 3:17, 4:4
major [2] - 24:13, 26:13
malice [3] - 3:20, 3:24, 4:5
mandate [1] - 29:4
mandatory [3] - 13:5, 13:8, 29:8
map [1] - 11:21
March [2] - 1:6, 16:9
MARCH [1] - 2:1
marched [1] - 24:20
married [1] - 15:4
matter [3] - 16:16, 28:24, 30:11
McHugh [18] - 1:17, 2:14, 8:4, 8:7, 8:14, 16:17, 20:18, 20:22, 20:25, 21:3, 21:5, 21:8, 22:6, 26:15, 26:19, 26:22, 30:5
mean [5] - 6:7, 7:6, 8:15, 12:16, 13:20
meaningful [1] - 29:25
mediation [3] - 28:16, 29:6, 29:9
mentioned [1] - 6:8
Metro [1] - 26:4
Mexico [1] - 21:13
middle [1] - 16:4
minor [1] - 24:2
minute [1] - 14:1
modern [1] - 23:5
Monday [4] - 17:24, 19:15, 19:16, 19:25
month [5] - 13:6, 13:8, 13:25, 14:9, 17:16
morning [4] - 2:4, 2:8, 9:15, 18:13
Morrison [1] - 2:9
motion [6] - 7:14, 7:19, 10:3, 10:7, 17:10, 27:2
motions [2] - 5:22, 16:10
mouth [2] - 3:23, 3:24
move [5] - 15:9, 16:6, 16:17, 19:5, 19:18
moved [1] - 23:8
MR [114] - 2:8, 2:12, 2:14, 2:15, 2:20, 4:19, 5:4, 5:9, 5:12, 5:14, 5:18, 6:1, 6:6, 6:21, 7:2, 7:13, 8:4, 8:7, 8:14, 8:15, 8:18, 8:24,

9:6, 9:15, 9:22, 10:3, 10:5, 10:10, 10:13, 10:16, 10:21, 10:24, 11:8, 11:12, 11:19, 11:23, 12:4, 12:7, 12:11, 12:16, 12:25, 13:20, 14:18, 14:19, 14:20, 14:25, 15:3, 15:11, 15:15, 15:18, 15:21, 15:25, 16:13, 16:17, 16:19, 16:25, 18:9, 18:11, 18:17, 18:23, 19:3, 19:6, 19:20, 19:24, 20:9, 20:16, 20:18, 20:19, 20:22, 20:23, 20:25, 21:3, 21:4, 21:5, 21:8, 21:12, 21:21, 21:23, 22:1, 22:5, 22:6, 22:8, 22:19, 23:2, 23:10, 23:15, 24:8, 24:12, 24:16, 24:19, 25:4, 25:7, 25:16, 25:22, 26:2, 26:5, 26:12, 26:15, 26:19, 26:22, 27:4, 27:6, 27:13, 27:21, 27:23, 27:25, 28:6, 28:10, 28:19, 29:15, 29:17, 29:19, 30:4, 30:5
mug [1] - 26:3
murder [1] - 13:6

**N**

narrowed [1] - 18:24
Navy [1] - 15:12
nay [1] - 10:8
necessary [3] - 13:13, 17:14, 24:6
need [19] - 2:23, 4:17, 9:5, 9:6, 9:13, 9:17, 9:18, 9:19, 9:20, 10:23, 11:11, 11:12, 12:6, 12:7, 12:10, 12:12, 12:14, 16:21
needs [1] - 8:20
negotiate [1] - 16:2
negotiating [1] - 13:23
Nevada [5] - 1:7, 1:14, 1:23, 3:25, 22:1
never [2] - 27:17, 28:4
New [5] - 1:18, 20:18, 21:9, 21:13
newsletter [2] - 4:10, 4:13
next [3] - 13:15, 17:2
night [1] - 18:19
nine [1] - 4:12

**Ninth** [5] - 3:1, 4:24, 6:9, 9:3, 17:24
**nobody** [1] - 2:17
**normal** [2] - 7:6, 29:13
**northern** [1] - 22:13
**Notre** [1] - 15:12
**November** [1] - 13:13
**number** [8] - 4:7, 4:8, 4:9, 4:12, 5:3, 5:11, 5:16, 12:14
**numbers** [1] - 11:14
**numerous** [2] - 24:21, 24:22

## O

**O'Connor** [2] - 2:9, 4:20
**O'CONNOR** [58] - 1:19, 2:8, 2:20, 4:19, 5:4, 5:9, 5:12, 5:18, 6:1, 6:6, 6:21, 7:2, 7:13, 8:15, 8:18, 8:24, 9:6, 10:5, 10:13, 10:16, 10:24, 11:8, 14:19, 14:25, 15:3, 15:11, 15:15, 15:18, 15:21, 15:25, 16:13, 18:9, 18:11, 18:17, 18:23, 19:6, 19:20, 19:24, 20:16, 21:12, 21:21, 21:23, 22:1, 22:5, 22:8, 22:19, 25:4, 27:4, 27:6, 27:13, 27:21, 27:23, 27:25, 28:6, 28:10, 29:15, 29:17, 30:4
**objection** [1] - 23:25
**obligated** [1] - 29:10
**obligation** [4] - 7:7, 7:24, 8:1
**obviously** [2] - 20:11, 25:17
**occur** [3] - 23:20, 29:2, 29:6
**occurred** [3] - 25:11, 26:8
**October** [5] - 13:2, 13:11, 13:12, 13:14
**OF** [2] - 1:1, 1:11
**officers** [2] - 22:9, 24:22
**official** [1] - 8:7
**Official** [2] - 1:22, 30:13
**officially** [1] - 9:18
**officials** [3] - 6:23, 7:22, 26:5
**old** [2] - 9:1, 9:2

**onboard** [1] - 3:11
**one** [23] - 3:6, 3:23, 7:15, 10:12, 10:14, 13:8, 14:2, 14:5, 14:8, 14:10, 17:14, 18:23, 22:6, 22:23, 23:7, 23:8, 23:15, 24:8, 25:2, 26:16, 27:4, 27:5, 27:8
**one-month** [1] - 13:8
**one-week** [2] - 14:8, 14:10
**open** [4] - 14:3, 14:6, 19:1, 22:19
**opposed** [2] - 7:14, 28:19
**orchestrated** [1] - 26:16
**order** [8] - 16:12, 17:1, 22:24, 22:25, 23:19, 24:5, 28:24, 28:25
**ordered** [4] - 11:4, 22:21, 22:22, 28:16
**orders** [1] - 28:11
**originally** [1] - 9:25
**otherwise** [1] - 14:3
**out-of-town** [4] - 20:4, 20:5, 21:10
**overseas** [1] - 23:14
**own** [2] - 17:18, 20:12

## P

**pardon** [1] - 29:16
**part** [10] - 5:5, 5:10, 7:6, 7:15, 16:7, 16:11, 17:3, 17:12, 20:13, 29:7
**particular** [6] - 5:15, 11:13, 11:15, 20:9, 28:22, 28:23
**parties** [1] - 5:13
**parts** [1] - 27:11
**passenger** [1] - 24:16
**passengers** [4] - 3:10, 4:25, 5:8, 7:11
**PD** [1] - 22:9
**people** [5] - 8:2, 12:24, 23:11, 24:21, 27:11
**percentagewise** [1] - 24:2
**perhaps** [1] - 22:20
**period** [2] - 13:18, 28:22
**personnel** [1] - 21:12
**pick** [1] - 8:10
**picked** [1] - 28:2

**pilot** [2] - 4:10, 4:12
**pilots** [1] - 7:7
**place** [3] - 20:11, 22:17, 24:25
**places** [1] - 20:10
**plaintiff** [1] - 2:14
**plaintiff's** [1] - 3:11
**plaintiffs** [9] - 1:5, 2:13, 2:15, 5:20, 9:12, 11:3, 25:5, 25:15, 26:12
**plaintiffs'** [1] - 8:18
**planning** [1] - 17:18
**play** [1] - 20:13
**playing** [1] - 15:12
**point** [5] - 12:17, 24:9, 27:4, 28:20, 28:23
**police** [3] - 5:24, 8:11, 25:23
**Police** [2] - 6:10, 6:15
**pool** [7] - 22:10, 22:14, 22:15, 23:21, 23:24, 24:7
**Portland** [1] - 21:13
**position** [1] - 8:16
**possible** [1] - 29:22
**postdisembarkatio n** [2] - 5:5, 5:8
**postdiversion** [1] - 4:24
**potential** [2] - 4:10, 17:20
**potentially** [1] - 18:15
**precipitating** [1] - 28:16
**preempted** [1] - 6:11
**preemption** [2] - 3:8, 6:17
**preference** [3] - 16:13, 18:13, 22:18
**premature** [1] - 28:20
**prepaid** [2] - 15:3, 15:8
**preparation** [1] - 16:24
**prepare** [4] - 17:16, 17:17, 29:22
**prepared** [1] - 16:20
**preparing** [1] - 16:12
**preponderance** [1] - 24:9
**preserving** [2] - 18:16, 18:18
**pretrial** [3] - 4:16, 16:12, 17:15
**pretty** [3] - 14:3, 19:22, 29:3

**problem** [8] - 4:11, 16:5, 17:8, 17:9, 17:17, 18:2, 22:16, 28:10
**problems** [1] - 23:16
**proceedings** [1] - 30:10
**proposed** [4] - 6:12, 6:21, 10:12, 10:14
**public** [1] - 6:3
**publication** [1] - 4:9
**pushed** [1] - 29:21
**put** [2] - 8:11, 26:10
**puts** [1] - 16:22
**putting** [2] - 12:21, 13:15

## Q

**questions** [2] - 11:22, 12:12
**quite** [1] - 23:5
**quote** [1] - 22:25

## R

**raise** [1] - 14:25
**range** [1] - 22:2
**rather** [2] - 9:11, 16:14
**ready** [3] - 13:2, 13:3, 13:18
**real** [1] - 3:18
**really** [6] - 11:18, 13:15, 22:12, 25:8, 27:2, 29:6
**reason** [2] - 27:8, 28:5
**reasoning** [1] - 5:20
**reasons** [2] - 7:18, 23:8
**receptive** [1] - 16:10
**recognize** [1] - 17:19
**recognized** [2] - 3:22, 18:20
**record** [2] - 12:3, 30:10
**red** [1] - 18:19
**REDA** [1] - 1:4
**regular** [1] - 20:1
**regulation** [1] - 7:17
**regulatory** [2] - 7:24, 8:1
**related** [1] - 18:22
**relation** [1] - 4:5
**relative** [1] - 24:2
**religious** [1] - 18:21
**remanded** [1] - 5:1
**remember** [2] - 3:11, 11:13

**Reno** [19] - 1:7, 1:23, 5:23, 6:10, 6:15, 8:11, 20:2, 20:6, 21:14, 22:9, 22:24, 23:5, 23:9, 23:14, 24:6, 25:12, 25:13, 26:25
**RENO** [1] - 2:1
**reopening** [1] - 16:8
**report** [7] - 5:23, 6:14, 7:7, 7:9, 7:18, 7:25, 8:1
**Reported** [1] - 1:22
**Reporter** [2] - 1:22, 30:13
**reports** [2] - 6:15, 6:23
**republication** [1] - 4:12
**request** [3] - 27:22, 29:20, 29:21
**requests** [1] - 28:25
**require** [1] - 10:24
**required** [2] - 7:18, 11:3
**requirements** [1] - 29:13
**reschedule** [2] - 15:11, 18:15
**resident** [1] - 24:14
**resolution** [1] - 8:25
**resolve** [2] - 27:19, 28:14
**resolved** [3] - 8:20, 9:10, 27:14
**respect** [3] - 7:5, 19:4, 24:5
**rest** [2] - 4:25, 18:14
**resulted** [1] - 25:20
**review** [1] - 28:12
**rooms** [2] - 26:6, 26:19
**ruled** [2] - 5:24, 10:19
**ruling** [3] - 4:24, 6:10, 7:16
**run** [1] - 8:11

## S

**San** [2] - 1:20, 20:16
**Santa** [3] - 1:16, 20:19, 20:20
**Saturday** [1] - 18:12
**saw** [1] - 24:17
**scene** [3] - 25:2, 25:3, 25:5
**schedule** [5] - 17:3, 17:8, 17:9, 17:12, 29:8
**scheduled** [4] - 13:5,

14:3, 14:13, 19:17
**scheduling** [3] -
2:25, 29:1, 29:5
**scope** [3] - 4:21,
6:17, 23:6
**searched** [1] - 26:6
**Seattle** [1] - 21:13
**second** [7] - 3:5, 8:4,
9:22, 9:23, 10:10,
23:17, 25:12
**security** [2] - 26:4,
26:16
**see** [10] - 4:1, 4:11,
4:14, 5:17, 6:24, 8:24,
12:24, 21:17, 22:16,
27:19
**select** [1] - 29:23
**selection** [1] - 19:5
**sense** [1] - 19:21
**separated** [1] - 13:8
**September** [14] -
13:22, 14:1, 14:7,
14:9, 14:11, 14:14,
14:24, 15:20, 15:21,
16:5, 16:15, 17:10,
18:6, 19:22
**served** [1] - 10:23
**service** [1] - 10:25
**session** [1] - 29:9
**set** [6] - 2:22, 7:19,
17:2, 18:7, 18:9, 20:1
**settle** [2] - 29:12,
30:1
**settled** [1] - 27:6
**seven** [2] - 4:8, 28:2
**several** [3] - 21:3,
25:3, 26:23
**Sheeley** [1] - 24:12
**shift** [1] - 15:22
**short** [1] - 13:17
**shot** [1] - 28:7
**shots** [1] - 26:3
**side** [4] - 6:24, 28:15,
28:25, 29:12
**side's** [2] - 16:11,
23:25
**sides** [2] - 24:13,
27:13
**signal** [1] - 17:7
**simply** [3] - 12:2,
22:17, 29:4
**single** [1] - 22:23
**sit** [2] - 20:6, 27:18
**six** [2] - 4:7, 28:1
**slightly** [1] - 6:13
**sometime** [1] - 16:3
**sooner** [2] - 9:11,
16:14
**sorry** [1] - 12:11
**sounds** [2] - 8:3,
9:13

**South** [1] - 1:23
**southern** [2] - 23:23,
23:24
**spring** [1] - 13:15
**squeeze** [1] - 17:10
**start** [3] - 17:23,
18:2, 18:11
**starts** [3] - 13:9,
15:23
**statement** [2] - 4:16,
17:15
**statewide** [2] -
22:14, 23:24
**STATUS** [1] - 1:11
**status** [1] - 27:2
**stewardess** [1] -
24:15
**stewardesses** [2] -
7:7, 8:9
**still** [5] - 3:20, 4:3,
4:22, 7:21, 15:23
**stipulated** [1] - 5:12
**stipulation** [1] - 5:2
**strain** [1] - 13:21
**Street** [1] - 1:23
**strictly** [1] - 23:23
**subject** [1] - 16:6
**subpoenas** [1] - 22:2
**subsequent** [1] -
6:15
**suggest** [1] - 23:22
**summarized** [2] -
7:3, 8:22
**summary** [2] - 10:1,
28:11
**summer** [1] - 13:19
**summonsed** [1] -
15:8
**Sunday** [2] - 19:11,
19:13
**Supreme** [2] - 27:15,
28:11
**surprise** [1] - 28:1
**system** [2] - 7:11, 8:2

**T**

**table** [2] - 7:21,
27:18
**Task** [2] - 6:16, 7:20
**teed** [1] - 6:24
**tele** [1] - 21:20
**tele-video** [1] - 21:20
**telephone** [2] - 2:18
**ten** [1] - 11:7
**tentatively** [2] -
23:19, 26:25
**term** [1] - 23:1
**terms** [8] - 13:1,
16:19, 16:21, 20:13,

24:9, 24:19, 24:24,
28:21
**terrific** [1] - 29:18,
29:25
**Terrorism** [2] - 6:16,
7:20
**testify** [2] - 21:16,
22:3
**testimony** [1] - 19:8
**themselves** [1] -
25:5
**theory** [1] - 25:17
**therefore** [2] - 3:15,
10:19
**thereto** [1] - 18:22
**third** [2] - 3:10, 3:13
**three** [6] - 5:3, 5:11,
5:16, 15:6, 22:7,
22:12
**today** [1] - 11:1
**tomorrow** [1] - 11:8
**took** [1] - 24:25
**Toronto** [1] - 21:5
**total** [1] - 22:14
**tougher** [1] - 28:11
**towards** [1] - 18:6
**town** [5] - 20:4, 20:5,
21:10, 24:4
**trailing** [1] - 13:7
**traipsed** [1] - 25:15
**transcript** [1] - 30:10
**travel** [4] - 17:8,
17:9, 17:17, 18:2
**trial** [39] - 2:22, 2:24,
3:1, 3:13, 3:16, 3:18, 4:2,
4:4, 4:11, 4:14, 4:17,
5:1, 5:6, 5:10, 6:24,
8:20, 9:4, 9:6, 9:7,
9:10, 13:2, 13:3, 13:6,
13:8, 13:14, 13:18,
14:16, 15:5, 16:5,
17:2, 17:7, 17:23,
18:3, 19:2, 20:4, 20:8,
22:2, 24:14, 28:17
**trials** [2] - 14:4,
14:13
**trip** [2] - 18:14, 18:18
**true** [1] - 25:10
**try** [4] - 15:24, 15:25,
16:1, 19:23
**turns** [1] - 14:21
**two** [19] - 2:22, 10:5,
12:12, 12:14, 12:22,
13:5, 13:6, 14:17,
14:22, 18:12, 18:19,
19:19, 20:22, 20:23,
20:24, 21:5, 22:5,
22:6
**two-month** [1] - 13:6

**U**

**under** [1] - 3:25
**unfair** [1] - 23:20
**unquote** [1] - 23:1
**unsuccessful** [2] -
25:18, 28:15
**up** [6] - 6:24, 8:11,
19:5, 23:8, 27:15,
28:2
**upheld** [1] - 6:9

**V**

**vacation** [2] - 15:3,
15:23
**valid** [1] - 3:12
**Vegas** [31] - 1:14,
20:5, 20:7, 20:10,
20:12, 20:20, 20:22,
20:23, 20:24, 21:14,
21:16, 22:3, 22:11,
22:12, 22:24, 23:6,
23:9, 23:14, 24:14,
24:21, 24:23, 25:8,
25:13, 25:14, 25:21,
26:6, 26:8, 26:21,
27:3, 27:9
**versus** [3] - 2:4,
22:12, 23:9
**video** [1] - 21:20
**view** [1] - 25:18
**Virginia** [1] - 1:23
**vis** [2] - 23:20
**vis-a-vis** [1] - 23:20
**volume** [1] - 23:6
**vs** [1] - 1:6

**W**

**Warsaw** [2] - 6:11,
6:17
**Wednesday** [1] -
19:17
**week** [7] - 14:2, 14:6,
14:8, 14:10, 17:9,
17:11, 17:25
**weekend** [2] - 15:13,
15:18, 19:18
**weeks** [6] - 14:17,
14:22, 15:6, 18:12,
18:19, 19:19
**West** [1] - 3:14
**whole** [2] - 11:14,
25:7
**wife** [2] - 15:4, 18:14
**WILLIAM** [1] - 1:19
**William** [2] - 2:9,
4:20

**willing** [1] - 28:23
**willingness** [1] -
17:5
**withdraw** [1] - 5:14
**witness** [4] - 21:9,
24:13, 25:2, 26:21
**witnesses** [18] -
17:17, 20:5, 20:13,
20:21, 21:6, 21:8,
21:15, 21:19, 21:22,
22:1, 24:2, 24:3, 24:4,
24:25, 25:3, 25:4,
26:11, 26:14
**word** [1] - 25:25
**words** [2] - 11:18,
23:22
**works** [1] - 19:6
**writ** [3] - 27:16,
27:20, 27:22
**written** [1] - 12:18

**Y**

**year** [4] - 12:22,
13:15, 17:3
**years** [1] - 27:17
**York** [4] - 1:18,
20:18, 21:9
**yourself** [1] - 17:17

John F. McHugh
NY Bar No. 2083541
Attorney at Law
6 Water St.
New York, NY  10004
212-483-0875
jfmchughpc@aol.com

Gilbert Gaynor
Cal. Bar No. 107109
Attorney at Law
820 Arguello Road
Santa Barbara, CA 93103-1816
805-962-5842
gglawyer@earthlink.com

Allen Lichtenstein
Nevada Bar No. 3992
3315 Russell Road
Las Vegas, NV 89120
702-433-2666
Attorneys for Plaintiffs
allaw@lvcoxmail.com

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

|  |  |
|---|---|
| REDA A. GINENA, NAHID I. GINENA, AMRE R. GINENA, SABRINA KOBERT, M. MAGDY H. RASIKH, M. SAMIR MANSOUR, AZZA EID, NAZMI M. NAZMI, and HEBA NAZMI,<br><br>Plaintiffs,<br><br>v.<br><br>ALASKA AIRLINES, INC.<br><br>Defendant. | CV-S-04-1304-MMD-CWH |

**DECLARATION OF ALLEN LICHTENSTEIN**

Allen Lichtenstein, pursuant to 28 U.S.C. § 1746, hereby makes the following declaration under penalty of perjury:

1.      I am co-counsel in the above-titled case, and am the only Nevada-licenced attorney among plaintiffs' attorneys. My office is located in Clark County, Nevada.

2.      Pursuant to a March 19, 2012, Order (Docket No. 225) a jury trial is scheduled for Monday, August 20, 2012 at 8:30 in Reno. Trial is expected to last approximately four to five weeks.

3.      I am scheduled to teach a class at UNLV during the Fall 2012 Semester (Journalism 401 –The First Amendment and Society). The class is taught on Wednesdays beginning at 5:30p.m. The class runs from August 28, 2012 to December 15, 2012.

4.      Maintaining the current trial schedule and location will make it impossible to both attend trial and meet with my class for at least the first and possibly others of the scheduled classes.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated this 19th day of June 2012.


_____/s/_____

Allen Lichtenstein

2