EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

|  |  |  |
|---|---|---|
| REDA A. GINENA, et al., | ) | CV-S-04-1304-RCJ-LRL |
|  | ) |  |
|  | ) | EXPERT DECLARATION OF |
| Plaintiffs, | ) | CAPTAIN MARK S. SWINT |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ALASKA AIRLINES, INC. | ) |  |
|  | ) |  |
| Defendant. | ) |  |
| _____ | ) |  |

**Introduction**

I, Mark S. Swint, declare:

I am over the age of 18, a citizen of the United States, a resident of Henderson, Nevada, not a party to this lawsuit, and competent to make this declaration.  If called upon to do so, I could and would competently testify as follows.

1

1.   I am a captain for United Airlines and have flown for United for over twenty years, the last eleven years as captain. I have over 38 years of experience in the aviation industry.

2.   I have been asked by counsel for the plaintiffs to express my opinion on the following two questions regarding the actions undertaken by Captain Swanigan on Alaska Airlines Flt. 694 from Vancouver B.C. to Las Vegas Nevada on the evening of September 29, 2003.

> a.   Did Captain Swanigan have reasonable grounds to believe that a person or persons had committed or were about to commit, on board his aircraft, an offence, or act that put the aircraft and/or his passengers in jeopardy or threatened the good order and discipline on the aircraft?

> **b.**   Did Captain Swanigan have reasonable grounds to make the decision to divert the aircraft to Reno?

**Educational and Professional Background**

3.   My flight training began in Bellevue, Washington. I finished my Private Pilot training at Michael Dewey Aviation in Santa Paula, California one year later.

4.   I attended high school in Issaquah, Washington for two years before finishing my senior year at Newbury Park High School in Newbury Park, California. I graduated in 1969. I attended Brigham Young University for one year and then went to Argentina for two years to serve as a missionary. Upon my return I again attended Brigham Young University for another year and a half. As I was supporting myself, I found it necessary to leave school before graduation in order to pursue my flying education.

5.   Upon leaving BYU I moved to Florida where I continued acquiring pilot licenses until I was qualified to begin working as a flight instructor.

6. In January 1976 I was hired as a flight instructor for Mountain West Aviation, a flight instruction and charter company in Provo, Utah. Within 6 months

I was promoted to Chief Pilot and served in that position until Oct.1979. I then moved to West Palm Beach, Florida to work for Beckett-Tilford Aviation as a Cessna Citation instructor and charter pilot. I moved back to Salt Lake City, Utah in December of 1980 to work for TigerAir as an aircraft salesman. I was hired in early 1982 by the Steiner Corporation, based in Salt Lake City, Utah, to serve as their Chief Pilot. I have remained involved with the Steiner Corporation providing consulting and pilot services for them to the present time. I left employment with Steiner Corp. in early 1984 to become Chief Pilot for Ms. Verna Harrah in Sun Valley Idaho. I flew her Westwind II corporate jet from 1984-1985 until being hired by United Airlines in July 1985.

7.   I began my career at United Airlines as a Flight Engineer on the B-727. I worked in that position for three years during which time I became a Line Check Airman for Flight Engineers. I then served for three years as a B-727 Flight Instructor in the United Airlines Flight Training Center. After that assignment I flew for three years as a DC-10 First Officer. My routes were primarily Hawaii, New Zealand, Australia and the Orient. I have, in all, 16 years of experience flying internationally.

8.   I moved to the B-727 Captain position in the fall of 1994, again serving as a Line Check Airman for new captains and first officers. I was captain and a LCA on the Boeing B-727 Fleet for 5 years. I am presently serving as a captain on the Boeing B-757/767 fleet. I fly primarily to Hawaii, Central America and on transcontinental domestic flights. I have served in this capacity for almost six years. From 1998 through 2001 I did additional service as an Interview Captain, conducting pre-employment interviews and hiring pilots for United Airlines.

9.   The position of Line Check Airman is a training position. It requires additional interviews and a recommendation from the chief pilot. It also requires additional training and authorization from the FAA. The primary responsibility of

a LCA is to supervise initial operational line experience of newly qualified captains and co-pilots. LCAs also conduct enroute line checks of experienced captains on a random basis.

10.   The Interview Captain position involves interviewing and assessing pilot applicants for employment. The interviews are conducted with one captain and one human resource agent. Both interviewers ask the applicant questions and solicit stories from his/her flying experience. We grade or rate their responses against a carefully defined set of criteria established by the company. In addition, the captain conducts a technically based interview of the applicant's aeronautical knowledge. Only the captain may grade this portion of the interview.

11.   My experience as an Interview Captain afforded me the opportunity to evaluate a great number of real life flying experiences as well as the manner or methods used by the candidates to deal with the various situations. The manner in which the applicant handled the situations that were related is what we graded and used to determine their suitability for employment.

12.   During the summer of 2001 I was the subject of a training video produced by United Airlines and viewed by all flight crews during the October 2001-October 2002 annual recurrent training events. That video was a Crew Resource Management training video. Each year the Training Center highlighted an event that best demonstrated the effective use of CRM principles in handling airborne incidents.

13.   My video focused on the handling of a real inflight emergency that arose during the course of a flight from on which I served as Captain. The video dealt with the proper way for a captain to make use of all available resources, both onboard and ground based, when dealing with serious emergencies in flight. It stressed the proper use of resource management and focused on the methods I used

to get input from my crewmembers, including the First Flight Attendant, and others.

14.  In the fall of 2001, shortly after the events of September 11th, I was chosen to represent the airline industry in a television campaign designed by the Travel Industry of America with the endorsement of President George W. Bush and the White House, to help stimulate and revitalize the economy and, more specifically, the travel industry. I appeared with President George W. Bush in two television commercials. One was broadcast domestically and the other was shown around the world. The ads ran for approximately four months.

15.  In preparation for this declaration I have carefully reviewed and considered the following documents;

- Reno/Tahoe Airport Police Dept. Continuation Report by Officer R. Beharry, dated 9/29/2003.
- Reno/Tahoe Airport Police Dept. passenger and crew statements submitted on the evening of 9/29/2003.
- Alaska Airlines Cabin Safety Reports submitted by Flight Attendants Dalee Callaway, Leann Maykuth and Robin Duus. October 1, 2003
- Captain's Report submitted by Captain Michel Swanigan. Oct 1, 2003
- Portions of the Alaska Airlines Inflight Training Manual
- FAA Advisory Circular 120-65.
- Deposition of Captain Michel Swanigan. Dated 11/17/2005
- Deposition of First Officer James Roberts. Dated 11/19/2005
- 1st Deposition of Ms. Dalee Callaway. Dated 11/23/2005
- 2nd Deposition of Ms. Dalee Callaway. Dated 12/12/2005
- Deposition of Ms. Le Anne Maykuth. Dated 11/18/2005

- Deposition of Ms. Robin Duus. Dated 11/21/2005
- Tokyo Convention Articles 1 -9
- Declaration of Passenger Ms. Kimberlie Shealy. 12/23/2005
- Declaration of Passenger Reda Ginena, 12/19/2005
- Federal Aviation Administration Press Release APA 01-02. Dated 01/11/2002
- Alaska Airlines Press Release. Dated 10/16/2001

**Conclusion**

16.  It is my expert opinion that Captain Swanigan did not have reasonable grounds to believe that a person had committed, or was about to commit, on board the aircraft, an offence, or an act contemplated in Article 1, paragraph 1, of the Tokyo Convention. Because he did not have reasonable grounds to believe any person or persons had committed, or were about to commit an offence or an act contemplated in Article 1, paragraph 1 b) his decision to divert flight 694 to Reno on September 29, was both capricious and arbitrary.

17.  Article 9, paragraph 1 says that the aircraft commander may deliver to the competent authorities of any Contracting State in the territory of which the aircraft lands any person who he has reasonable grounds to believe has committed, on board the aircraft an act which, in his opinion, is a serious offence according to the penal law of the State of registration of the aircraft. Since Captain Swanigan had no knowledge of the facts aboard his aircraft, he had no cause to believe that any offence either had been committed or contemplated. He arbitrarily decided that all nine members of the Ginena party were guilty and he acted capriciously by demanding the arrest of the entire party.

**Basis for Conclusion**.

18.  The captain of an aircraft acts as the 'Pilot in Command' of that aircraft and as such bears the responsibility for the safe conduct of the flight and the safety

of the passengers, as well as the actions of his/her crew. The captain's decisions are final and are to be respected by the crew.

19. The exercise of this authority is addressed by Article 6 of the Tokyo Convention which states that the captain has authority, when he has reasonable grounds, to take certain actions with regards to the appropriate restraint and control of such passengers who may pose a threat to the safety, discipline and good order of the aircraft or those aboard. The exercise of this authority requires a reasonable belief that a legitimate threat exists. It is not to be taken lightly nor used capriciously and it requires prudence and wisdom in its application.

20. Accordingly, captains receive training in the proper use of their captain's authority. All pilots are taught the principles of Crew Resource Management, (CRM), which include principles of good leadership, sound decision-making, and elements of successful interpersonal relationships, including conflict resolution and compromise. The fundamental premise behind this training is that all of the skills listed above require that knowledge be shared in a timely manner and that the person with the ultimate authority has the obligation to solicit input from all available and reasonable sources prior making important decisions and exercising his authority. In order to make an informed and prudent decision it is requisite to become as informed as is reasonably possible within the time constraints and framework of the situation. Alternatively, it is impossible to make an informed decision without being well informed.

21. Every major airline in the U.S., including Alaska Airlines, has CRM training. These principles have become and are now the accepted standard of professional conduct for aircrews in the U.S. airline industry. It is accepted within the airline industry, and has been since long before 2003, that the enhanced crew co-ordination brought about by the institution of CRM training programs

throughout the airline industry has contributed significantly to the remarkable safety record of the airlines in recent years.

22. The application of even the most basic elements of CRM would almost certainly have brought about a quick and much less eventful resolution to the incident at issue. The failure to do so certainly facilitated the continuation and escalation of the incident, allowing it to develop far out of proportion to what it merited.

23. While the exact structure of CRM training may vary slightly from one company to the next, the principles are structured around several very basic components. They are;

- Inquiry.
- Advocacy
- Conflict Resolution
- Critique.

24. When properly applied, the principles of CRM allow the captain to make sure that his decisions are based on sound judgment and a fullness of the facts. Applying these standard industry practices to a given situation allows a captain to make prudent decisions and be confident as to the reasonableness of his actions. The application of these principles allows a pilot to confidently determine when he has reasonable grounds to exercise the protocols of the Tokyo Convention. Without applying these principles, or more specifically, without gathering all the available facts, as taught by these principles, it is impossible to claim that one has reasonable grounds. Indeed, without gathering all the available facts, it is impossible to accurately formulate any legitimate grounds at all.

25. Another purpose of CRM is to ensure that the pilot in command and his/her fellow crewmembers conduct the flight safely and legally while, at the same time, protecting and respecting the rights of the passengers.

26.   Accordingly, a captain is responsible for the events and actions taken by the crew on either side of the cockpit door and must be apprised of any significant occurrence that affects the safety of the passengers and the safe outcome of the flight.

27.   The first principle or tool of effective command and leadership is inquiry. Prior to taking any extraordinary action it is incumbent upon the captain to gather all the facts available to him in order to make a prudent decision. This is neither a difficult nor complex exercise. It may be accomplished in several ways. The most basic and obvious way is to simply ask, "what is going on?"

**First Communication From Cabin**

28.   Ms. Callaway's first communication with the cockpit notified the pilots that she was having a "bit of a problem" with some passengers (Swan dep. 94:5-7). She requested that Captain Swanigan arrange to have authorities meet the plane in Las Vegas. She also stated, however, that she had the situation under control (Swan dep.94:9). Captain Swanigan's response was to ask, "Is there anything urgent, anything I need to know?" she replied that no, she had it under control. Captain Swanigan 's reply was, "okay."

29.   At his deposition, Captain Swanigan was asked, referring to this event, "Was there anything else said between you and Dee?" His response was, "Absolutely not. Nothing!" (Swa dep 97:12-14)

30.   If, in fact, the situation was just a "bit of a problem" and she's "got it under control" the appropriate response from Captain Swanigan would have been to press Ms. Callaway further as to why she felt authorities were needed. This interrogatory need not have been in the form of a challenge to her but rather a simple attempt to understand the situation. This most likely would have led to a brief explanation, from Ms. Callaway, of the events that transpired up to that point. At that point a prudent captain would have offered to turn on the seat belt sign and make a

strongly worded announcement directing passengers to take their seats. The captain may even have directed his comments towards the particular passengers involved.

31.   Captain Swanigan's only query to Ms. Callaway was to ask if there was anything urgent, anything they needed to know? (Swa dep. 94:8-9). However, professional standards require that we must go beyond simple yes or no questions if we want true communication. A yes or no question is one that is answered with a simple yes or no. We are obligated, instead, to ask 'who, what, why and how' questions that require a more complete answer. This event highlights the validity of that concept. Ms. Callaway was able to answer Captain Swanigan's question with a simple "no, I think I've got it under control!" (Swa dep. 94:9). Had she been obligated to answer a 'what' question such as, 'what is going on back there?' she would have been compelled to respond with more detail.

32.   The decision to make a request for authorities is serious and a captain should only do so when he determines that the conditions warrant further action. Article 9 paragraph 1 of the Tokyo Convention clearly indicates that an aircraft commander could deliver to competent authorities, persons who he had reasonable grounds to believe had committed or were about to commit serious offences on board his aircraft. Captain Swanigan's own testimony indicates that he agreed to make such a request based only Ms. Callaway's petition, (Swa 94:11-22), with no knowledge of, or indication that, any offence had or was about to be committed. Furthermore, he made no attempt to establish that there was any basis for having the passengers remanded to the authorities.

33.   As the commanders of the aircraft we are responsible to act as leaders and be prudent in our decisions. A few simple follow-up questions to such a request as Ms. Callaway's would have provided much needed information. This does not take much time and is not difficult to accomplish during the cruise portion of the flight when the autopilot has control of the airplane and the workload is light.

34.   It is unreasonable and unprofessional to call for police without knowing why they are being requested. I have never seen a captain take such action based solely on the request of a flight attendant. This is not to say that the flight attendant's perceptions and desires are not to be respected. Rather, it is the first step in a chain of inquiry that may or may not lead to further action.

**Second Communication**

35.   A few minutes after her first call, Ms. Callaway once again called the cockpit and informed Capt. Swanigan that she had "lost control of the first class cabin" (Swa Dep. 96:14 and ASA 042)

36.   At the time Ms. Callaway made this call Ms. Duus was apparently dealing with the passengers. According to the declaration of another first class passenger, Ms. Kimberlie Shealy, the following events were transpiring; (referring to the passenger who had been standing) she says, "He took his seat.  She wanted to reiterate the fact that he was not supposed to be in the aisle.  He said, "I am sitting down".  She then gave them a piece of paper and insisted that they fill it out.  The older gentleman looked shocked.  Then the younger man to the left said something to the flight attendant.  I did hear it and did not think it was anything insulting or inappropriate but do not remember what it was precisely.  Then the flight attendant went ballistic and began pacing between the first row and the galley and yelling. She was completely irrational, the man, and his son could not get a word in." (Shealy dec 3:3-9)

37. I note here that the passengers were all seated when a woman in the first row said something to, presumably, Ms. Duus. According to Ms. Shealy, "When the woman spoke the flight attendant said ""that's it I'm taking this plane down"". All discussion and loud voices stopped.  She went and got a phone and was standing for a second in the middle of the aisle by the galley.  She then went behind the partition on the left (port) side of the aircraft."  (Shealy dec. 3:15-18)

38. Ms. Shealy continues: "Then the lady in row one next to the right port, starboard yelled something.  Again I do not remember what it was but I did not think it was impolite nor inappropriate considering that they were being accused of something that they clearly did not understand and were being humiliated before the entire aircraft as the flight attendant was yelling a the top of her lungs." (Shealy dec. 3-10-14)

39.   It was during this exchange that Ms. Callaway called for the second time. This was a second opportunity for Captain Swanigan to ask the questions he should have asked on the prior occasion. He states that he could hear yelling in the background through the interphone. Yet, once again, he took no thought to ask, 'Who's yelling?' or 'What's going on back there?" Had he done so he would have learned that it was, in fact, Ms. Duus who was being the most vocal, (ASA 007 & Shealy dec 3) and that the passengers were in their seats (Cal dep. 147-148 & Shealy dec.). He would have also learned that the argument was, at this point, over paperwork and forms.

40.   Instead, Captain Swanigan made the instant decision to divert the plane to Reno rather than continuing on to the intended destination, Las Vegas.  At the time of this decision the airplane was approximately 100 nm past Reno and 200 NM from Las Vegas. At that point the difference in flight time was approximately 25 minutes. This is based on the fact that although the normal arrival procedures at Las Vegas require considerable vectoring, which would take additional time, an aircraft which requests expedited handling can avoid that and receive a more direct clearance to the runway. This is standard in such events and is similar to the type of handling that Alaska Airlines flight 694 received from the Reno controllers.

41.  Captain Swanigan has stated that he was on the ground in Reno within about 8-10 minutes (Swa dep. 106:4) from approximately 100 miles away. In fact, I believe the time was closer to 12-15 minutes based on aircraft performance and

regulatory constraints regarding airspeed at low altitudes. The additional 100 miles of distance to continue on to Las Vegas would have been flown at cruise altitudes and would have been traversed in about 12-13 minutes depending on high altitude winds. Altogether the difference should have been about 22-25 minutes.

42.   On Swa dep 97:17-20 Captain Swanigan declares to his first officer, " I don't know what's going on back there, but you know what? I'm going to put this airplane on the ground first and ask questions later. Once again, on Swa dep137:7-13 he states; "I felt there was a possibility that my airplane and my crew were in jeopardy at that point. There's no time for discussion. I'm not going to sit there and burn valuable time in the air having some sort of a discussion with somebody that I feel has put my airplane in jeopardy. I'm going to land the airplane first and ask questions second at that point." On Swa dep 115:14 Captain Swanigan states that once on the ground he told Ms. Callaway, "Dee, I have no idea what went on back there."

43.   Later in his deposition Captain Swanigan again reiterates his lack of knowledge of the events that led to his diversion. After the plane was diverted and the passengers were removed Captain Swanigan told Mr. Ginena (Presumably. There is some question as to the identity of the passenger to whom he was speaking at that time), "I made the decision to put the airplane on the ground and ask questions later." (Swa dep. 123:10-11).

44.   Captain Swanigan stated that when Ms. Callaway called him she "was totally distraught, crying; sounded to me like she was crying.  I don't know if she actually was." (Swa 96:20-21).

45.   At this point Captain Swanigan had several options available to him. One concern should have been for the safety and welfare of his A flight attendant. Why was she distraught? What could he do to help her? Should he call on the flight attendants in the back to change places with her and give her a break? A more

important question for him to ask would have been, "why are you crying? What is going on back there?"

46.  In light of the improvements that have been made in 'crew concept' behavior, it is difficult to understand how Captain Swanigan could have allowed this event to escalate to the level that it did without ever asking anything about it.

47.  The use of the viewing port, located in the cockpit door, is another effective form of inquiry available to pilots. After the events of 9/11/2001, the Federal Aviation Administration mandated that all 6,000 commercial airliners in the United States be retrofitted with reinforced cockpit doors by April 9, 2003, (FAA Press Release APA 01-02). One of the significant improvements made to the doors designed for Alaska Airlines, in addition to their enhanced impenetrability, was the installation of a "thick acrylic window" (Alaska Airlines press release 10/16/2001). The larger viewing port was installed to give pilots a better idea of the activities occurring on the other side.

48.  This viewing port is significantly larger that the common 'peep hole' of the average hotel room with which we are all familiar. It provides a significantly clearer view and is designed to give the pilots an adequate idea of the circumstances on the other side of the door. The viewing port is mounted in the door and is within arm's reach of the pilots when seated. It is a simple matter to stand up, turn around taking no more than one step and look through the port. The entire process takes less than 5 seconds. It is clear from the depositions of both the pilots that neither one availed themselves of this resource.

49.  According to the depositions of both Ms. Callaway and Ms. Duus, as well as the declaration of Ms. Kimberlie Shealy, the most vocal part of the conflict occurred after the involved passengers had returned to their seats and were otherwise behaving (Cal dep 147-148, Duus Dep. 35:12-14, Shealy dec.3:7-9). It is logical to assume that if either Captain Swanigan or F/O Roberts had looked

through the port and seen that all the passengers were seated they would have felt the need to investigate further before taking such drastic measures as they did.

50. In fact, First Officer James Roberts confirms this. He was asked in his deposition, "If you and the captain had been aware at the time that she told you that she was losing control of the first class cabin, all those passengers had in fact taken their seats and were just having an argument, would you have deemed that to be a situation that required the airplane to be diverted?" His response was, "It would certainly be a lower threat level than if they were standing up, but it would still be—it would still be threatening behavior, I suppose, but it would call for perhaps a less drastic response, I guess." (Roberts dep. 77:1-13)

51. The statement by Ms. Callaway that she had "lost control of first class" should have evoked inquiry and further investigation from the flight crew. Instead, Captain Swanigan states that he decided to put the plane on the ground without further comment or discussion (Swa Dep. 97:10-1). In response to the question posed during his deposition, "Was there anything else said between you and Dee?" his response is, "Absolutely not. Nothing!" (Swa Dep 97:12-14).

52. Even though Captain Swanigan has testified that he heard shouting, he made no attempt to determine who was doing the yelling.

53. My primary responsibility as an Interview Captain, involved in the assessing and hiring of pilot applicants, was to evaluate an individual pilot's suitability for employment at United Airlines based on their accounts of various events that they had experienced during their flying careers.

54. Interview Captains and Human Resource representatives would ask questions designed to elicit stories from the applicant. These responses would be followed up with probing questions which were used to get to the finer details of what had transpired. Stories such as the event in question here were not at all uncommon, although never did I see a final result such as this. However, in the

interview, the final resolution of the events was not so important to us as were the methods and steps taken to get to that resolution. We wanted to know specifically what actions the captain had taken prior to making his decisions. Those actions were measured against a set of criteria established by commonly accepted standards

55.  It is universally understood, and accepted as the standard industry wide, that a captain has the authority and the latitude to take whatever reasonable action he deems necessary. The effective command of an aircraft is not a democracy. However, captains are held responsible and accountable for the exercise of such command and expect him to exercise due diligence prior to taking that action. Actions taken in haste and without an understanding of the pertinent facts are unreasonable and in some cases even dangerous.

56.  Had Captain Swanigan related this story during a pre-employment interview, the Interview Captain's first response or follow up question would have been, 'When your flight attendant requested that the authorities meet the plane did you ask her what was going on and why she felt the authorities were needed?' That would have been followed up with, "Did you and the flight attendant discuss any other options or methods for dealing with the passengers that she might try first?"

57.  Another appropriate question would have been, "Do you think a warning or admonition from you, as the captain, transmitted by her to the passengers might have helped calm the situation?" It would have been appropriate to ask if he had attempted to speak to the other flight attendants in order to get their assessment of the events that were transpiring.

58.  Based on this story, Captain Swanigan would not have been successful in an interview with United Airlines not because he diverted to an alternate destination but because he did so without any attempt whatsoever to ascertain the

pertinent facts or exercise his leadership and command authority to help resolve the situation.

59.   Obviously, Ms. Callaway looked to Captain Swanigan for guidance and leadership; otherwise she would not have felt compelled to call him. She recognized that he was the commander of the aircraft and apparently thought it would do some good to get him involved.

60. Rather than taking command of the situation, Captain Swanigan reacted passively, leaving the flight attendants to continue their course of action, which resulted in the escalation of the event.

61.  There was no urgency in the cabin. No one was trying to breach the security of the cockpit door. No one was threatening the crew or the other passengers with any form of bodily harm. No threats were made towards the safety of the aircraft itself. Absolutely nothing was accomplished by diverting the plane to Reno.

62.The only issue in the passenger cabin was a disagreement between some passengers and the flight attendant. The fact that the situation was resolvable is proven by the fact that the passengers did, in fact sit down, as evidenced by F/A Duus' statement that, "They were quiet after our captain called back and informed us that we were in lockdown." (Duus Dep. Pg. 37:19-25)

63.  A more timely and direct involvement by Captain Swanigan would have easily stopped this event before it escalated beyond a brief dispute between a flight attendant and a passenger.

64. Oddly, though Captain Swanigan was too passive in flight, he became overly aggressive once on the ground. He wanted all nine passengers removed from the plane and arrested on the spot, even though Ms. Duus has stated in her deposition that only a few of the passengers were involved in any way. In fact, Ms. Duus states clearly that the passenger seated in 3D was, "basically trying to get

everybody not to talk anymore." (Duus dep. 34:11-12). Ms. Callaway states, of the lady in seat 1A, that, "she was more of the one that was trying to get everybody kind of calmed down. I remember her being the voice of reason of the whole." (Call dep 169:13-24).

65.  Captain Swanigan's insistence that the entire group be criminally charged appears arbitrary and capricious. He certainly had no reason or evidence to believe that all nine passengers were equally culpable of whatever offence he assumed had been committed.

66.  The inaction on the part of the Captain to assist the flight attendants created the opportunity for the flight attendants to inflame the situation with ill-timed issuance of demands, forms and threats. As a result more than seventy people were delayed and inconvenienced and significant expense was incurred by Alaska Airlines. A few simple questions and actions in the beginning could have avoided it all.

67.  It is my opinion, that it was impossible for Captain Swanigan to have had reasonable grounds to believe, due to his lack of inquiry and willingness to provide leadership in this event, that any offence was being or about to be committed by any passenger on board Alaska Airlines flight 694.  His actions were arbitrary and capricious.

68.  It is my opinion that Captain Swanigan had no reasonable grounds to believe that there was any threat to the safety or good order or discipline of either the aircraft or the passengers and that no offence had occurred nor was imminent when he decided to divert the plane to Reno and demand the removal and arrest of all nine members of the Ginena party. His decision to divert was arbitrary and capricious.

1        I declare under penalty of perjury of the laws of the United States that the

2    foregoing is true and correct.  Executed this 5th day of January 2006, at

3    Henderson, Nevada.

4                                    _____

5                                   MARK S. SWINT

1    I declare under penalty of perjury of the laws of the United States that the

2    foregoing is true and correct. Executed this 5th day of January 2006, at

3    Henderson, Nevada.

4

5    / MARK S. SWINT

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# Press Release

close window

Contact: Alison Duquette
Phone: 202-267-3462
APA 01-02
Date Posted: January 11, 2002

**FAA Sets New Standards for Cockpit Doors**

WASHINGTON - In response to President Bush's call to strengthen aircraft security, the U.S. Department of Transportation's Federal Aviation Administration (FAA) today published new standards to protect cockpits from intrusion and small arms fire or fragmentation devices, such as grenades. The Aviation and Transportation Security Act authorizes the FAA to issue today's final rule that requires operators of more than 8,000 airplanes to install reinforced doors by April 9, 2003.

Concurrent with the rule, the FAA is also issuing a Special Federal Aviation Regulation (SFAR) to require operators to install temporary internal locking devices within 45 days on all passenger airplanes and cargo airplanes that have cockpit doors. Beginning on Oct. 17, the FAA issued a series of SFARs that authorized short-term door reinforcement by providing airlines and cargo operators with temporary relief from certain FAA standards. The major U.S. airlines voluntarily installed short-term fixes to doors on 4,000 aircraft in 32 days. The SFAR stated that a long-term fix that meets FAA requirements must be installed within 18 months.

"Fortifying cockpit doors is a critical part of assuring the safety and security of our aviation system," said U.S. Transportation Secretary Norman Y. Mineta. "As we move forward, the Department of Transportation will continue to meet the challenges of protecting our nation's travelers and transportation infrastructure."

"The FAA cut through red tape and the airlines fortified cockpit doors quickly following Sept. 11," said FAA Administrator Jane F. Garvey. "I strongly encourage operators to move forward with the same determination to permanently strengthen and protect our nation's fleet."

The FAA rule sets new design and performance standards for all current and future airplanes with 20 or more seats in commercial service and all cargo airplanes that have cockpit doors. Specifically, the rule: -Requires strengthening of cockpit doors. The doors will be designed to resist intrusion by a person who attempts to enter using physical force. This includes the door, its means of attachment to the surrounding structure, and the attachment structure on the bulkhead itself. The FAA rule uses an impact standard that is 50 percent higher than the standard developed by the National Institute of Law Enforcement and Criminal Justice. In addition to intrusion protection, the FAA is using a standard sufficient to minimize penetration of shrapnel from small arms fire or a fragmentation device. The agency is providing guidance to operators on acceptable materials. All new doors must meet existing FAA safety requirements. -Requires cockpit doors to remain locked. The door will be designed to prevent passengers from opening it without the pilot's permission. An internal locking device will be designed so that it can only be unlocked from inside the cockpit. -Controls cockpit access privileges. Operators must develop a more stringent approval process and better identification procedures to ensure proper identification of a jump seat rider. -Prohibits possession of keys to the cockpit by crewmembers not assigned to the cockpit.

Prior to Sept. 11, the FAA was working with the International Civil Aviation Organization (ICAO) to strengthen international security standards for airplanes. Today's rule expedites the work of an Aviation Rulemaking Advisory Committee (ARAC) working group that was tasked to develop harmonized security-related design provisions, including protection of the cockpit. The FAA encourages foreign civil aviation authorities to review the FAA's new rule and adopt comparable standards. As announced by the President on Sept. 28, the FAA will administer a federal grant program to help the U.S. airline and cargo industry finance aircraft modifications to fortify cockpit doors, alert the cockpit crew to activity in the cabin and ensure continuous operation of the aircraft transponder. Funding may be provided through grants or cost sharing arrangements. The President requested $300 million from Congress to help fund these initiatives. Congress appropriated $100 million.

Once the designs are ready and approved by the FAA, the agency believes that airlines will have an opportunity to install the doors during routine maintenance checks. The purchase and installation cost of an enhanced cockpit door is estimated at between $12,000 and $17,000. The total cost to airlines is estimated to cost between $92.3 million and $120.7 million over a 10-year period, including increased fuel consumption costs resulting from heavier doors.

The final rule and SFAR are available on the FAA's web site at www.faa.gov/avr/arm/npm.htm

###

An electronic version of this news release is available via the World Wide Web at http://www.faa.gov/apa/pr/index.cfm

Questions About This Page

## Alaska Airlines Becomes First Major Carrier To Install Impenetrable Bulletproof Cockpit Doors

10/16/2001 10:11 a.m.

SEATTLE -- Alaska Airlines said today it is installing reinforced cockpit doors on all its aircraft to make them impenetrable and bulletproof.

The first cockpit door modification on an Alaska jet, a Boeing 737-400, is being completed today.

Alaska, the nation's ninth largest major carrier, is collaborating with Raisbeck Engineering, Inc., of Seattle, Wash. on the door modifications.

"Nothing is more important than the security and safety of our crews and customers," said Bill Ayer, Alaska's president and chief operating officer. "Ever since an incident involving Alaska Airlines almost two years ago, our focus has been on finding a cockpit door that assures security against unauthorized entry to the flight deck. The events of September 11 hastened that resolve and now we are convinced Raisbeck Engineering has found an excellent solution."

Alaska's fleet consists of 102 aircraft, including 70 Boeing 737 aircraft and 32 Boeing MD-80s. Modifications to Alaska's entire Boeing 737 fleet is expected by November 15, with modifications to the carrier's MD-80 fleet to follow afterwards.

The project's initial phase, valued at more than $1.2 million, is the first of its type by a major U.S. carrier. Costs incurred for the project are eligible for reimbursement under federal guidelines.

Raisbeck Engineering, located only a few miles from Alaska's corporate headquarters, has been working on technical answers and applications to the issue of cockpit security for well over a year. "As it turns out, the recent attack on our country brought Raisbeck and Alaska together on this issue," said Ayer. "We couldn't have a better partner."

The super-strengthened doors on Alaska's cockpits will feature an array of advanced technical innovations and applications that restrict entry and fully meet all federal safety certification guidelines.

Utilizing the design specifications of Raisbeck engineers, the existing doors on Alaska jets, designed by Boeing, are being modified by the airline's maintenance technicians to include the following features:

? Panels of Kevlar fabric on the cockpit side of the door. Kevlar, a high tech composite, combines extraordinary strength and low weight to provide toughness five times stronger than steel for protection against ballistics.

? "Kickproof" grilles on the cabin side of the cockpit door that can withstand a minimum of 1500 pounds of force.

? A secure and sturdy locking mechanism that can be locked and unlocked by the pilots from the seated position.

? One and one-quarter inch thick acrylic windows that are bulletproof yet clear to allow pilots to see into the cabin from either a seated or standing position

? Specialized hardware that includes a new door handle designed to make it much more difficult for anyone to grip in order to gain leverage.

"Nothing in my 40 years as an aeronautical engineer has been more satisfying than designing a way to contribute to the security and safety of commercial aviation through these cockpit door modifications," said James Raisbeck, chairman of Raisbeck Engineering and its subsidiary corporation, Raisbeck Commercial Air Group, Inc. "Our team may have had more technically complicated projects in the past, but I can't think of one more important." In addition to Boeing jets, Raisbeck said his firm has a modification for the cockpit doors of Airbus jet aircraft.

Raisbeck Engineering, founded nearly 30 years ago, has designed myriad technical refinements for various aircraft ranging from turboprops to large commercial jets. The firm's areas of expertise include engine performance enhancement, noise abatement, safety modifications and customer amenity improvements. For more information, visit http://www.raisbeck.com.

Alaska Airlines serves 44 cities in Alaska, the Lower 48, Canada and Mexico. For more news and information visit the Alaska Airlines Newsroom on the Internet at http://newsroom.alaskaair.com. Reservations can be made at www.alaskaair.com.

VIDEO AVAILABLE

Video of a cockpit security door demonstration with large caliber handguns and a baseball bat along with sound bites from Alaska Airlines and Raisbeck executives will be available by satellite at the time shown below.

Start time:      &nbsp12:00-12:15pm Pacific / 3:00-3:15pm Eastern
Satellite:       &nbspGalaxy 11
Transponder.     &nbspB C-Band Analog

Case 2:04-cv-01304-MMD-CWH   Document 287-4   Filed 12/03/12   Page 24 of 24

Downlink Frequency:   &nbsp3860 Vertical
Audio:          &nbsp6.2/6.8
Technical Trouble line:   &nbsp206-404-4172

The feed can be found on: Galaxy 11, which is located at 91degrees West Longitude, Transponder 8
C-Band Analog. Downlink Frequency is 3860 Vertical. The Audio Sub-carriers are at 6.2/6.8  For
technical trouble please call. 206-404-4172

STILL PHOTOS
High resolution still photos of the cockpit security door demonstration are available by e-mail from Don
Conrard in the Alaska Airlines corporate communications department. Phone 206-431-7057. E-mail
don.conrard@alaskaair.com.

**EASYBIZTRAVEL AGENTSCARGOAFFILIATESNEWSLETTERCAREERS**
Site Map  |  Company Info  |  Contact Us  |  Help  |  Copyright  |  Español  |  **Privacy Policy**

R4