# EXHIBIT D

# United States District Court

# District of Nevada

|  |  |
|---|---|
| _____ ) | Case No.   CV-S-04-1304- |
| REDA A. GINENA, NAHID I. GINENA ) | RCJ-LRL |
| AMRE R. GINENA, SABRINA KORBERT, M ) | |
| MAGDY, M. RASIKH, M. SAMIR MANSOUR, ) | |
| AZZA EID, NAZMI M. NAZMI, AND HEMA ) | Expert Report of |
| NAZMI, ) | |
| ) | Mark S. Swint |
| Plaintiffs, ) | |
| ) | |
| v ). | |
| ) | |
| ALASKA AIRLINES INC. ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**Introduction**

I have been retained by counsel for the plaintiffs to opine regarding conduct of the flight crew with respect to the plaintiffs and particularly the decision by the captain to divert the flight from its intended route for the purpose of having the plaintiffs removed and remanded to custody.

1

**Qualifications**

My expert opinion in this matter is predicated on over 38 years of aviation experience covering operations ranging from flight instruction, Alaskan bush flying, charter, corporate flight operations and major airline line experience. I have been a pilot for United Airlines for over twenty years and presently serve as a Captain on the Boeing B-757/767 fleet. I have served in this capacity for almost six years. Prior to that I was captain on a Boeing B-727. I have also served for three years as a B-727 flight instructor in the United Airlines Flight Training Center. I have served at various times as a Check Airman conducting line checks and providing initial operating experience for Flight Engineers, First Officers and Captains. Additionally, I served for three years as an Interview Captain conducting employment interviews and hiring pilots for United Airlines. I was the subject of a training video produced by United Airlines and viewed by all flight crews during the 2001-2002 training events. That video was a Crew Resource Management training video and centered on the handling of an inflight emergency during which I served as Captain. The video dealt with the proper use of all available resources, both onboard and ground based in dealing with serious emergencies in flight.

I have served as Chief Pilot for Mountain West Aviation, a flight instruction and charter company in Provo Utah from 1976-1979. Additionally, I served as Chief Pilot for Steiner Corporation based in Salt Lake City in 1982-1984. I have remained involved with the Steiner Corporation providing consulting and pilot services for them to this time. I also served as Chief pilot for Dover Enterprises based in Sun Valley Idaho from 1984-1985 until being hired by United Airlines.

I have published 17 articles on various aspects of general aviation flying for SWAviator Magazine. The articles can be accessed on-line at www.SWAviator.com. A list of titles and issue dates is provided on Addendum 2 at the end of this document.

My fee for my expert opinion is $250.00 / hr. I have never served as an expert witness prior to this case.

**Conclusion and Basis for My Conclusion**

The captain of an aircraft acts as the 'Pilot in Command' of that aircraft and as such bears the responsibility for the safe conduct of the flight and the safety of the passengers, as well as the actions of his/her crew. The captain's decisions are final and are to be respected by the crew. The exercise of this authority requires prudence and wisdom and is not to be taken lightly or used capriciously. Accordingly, captains receive training in the proper use of that authority and, to that end, are taught principles of leadership, decision-making, crew resource management and elements of successful interpersonal relationships, including conflict resolution and compromise. All crewmembers are taught basic 'people skills' and are given specific direction and guidelines regarding the treatment of passengers and co-workers. Portions of this training are found in the pilot's Flight Operations Manual (FOM) and the flight attendant's Inflight Training Manual as well as other handbooks and manuals as may be appropriate.

The purpose of this training is to ensure that the pilot in command and his/her fellow crewmembers will conduct the flight safely and legally while, at the same time, protecting and respecting the rights of the passengers.

As Pilot in Command, the captain is responsible to ensure that all members of the crew fulfill their respective duties properly and professionally. Accordingly, a captain is

responsible for the events and actions taken by the crew on either side of the cockpit door and must be apprised of any significant occurrence that affects the safety of the passengers and the safe outcome of the flight.

With all of the above in mind, and relying upon the information contained in the Reno/Tahoe Airport Police Department police reports of the passenger and crew statements, the Reno/Tahoe Airport Police Department continuation report written by Officer R. Beharry #306, Cabin Safety Reports of the three flight attendants, the Passenger Disturbance/Diversion report written by Captain Michael Swanigan, the Alaska Airlines Inflight Training Manual and FAA Advisory Circular AC 120-65, it is my opinion that there were deviations from established policy and deficiencies in crew co-ordination and communication leading to hasty decision-making and the unnecessary diversion of the flight and subsequent inconveniencing of all of the passengers onboard.

To make my point I shall review the individual steps in the event chain. Prior to doing so, however, it should be stated that although the initial actions by the flight attendants are not necessarily the responsibility of the captain, the ensuing events and resultant outcomes fall directly under his purview and as such bear reviewing here. Their actions are theirs alone to account for but their resultant effects influenced Captain Swanigan's decision and actions and to understand his actions it is necessary to understand the events and the information available to him prior to making those decisions.

'A' flight attendant Dalee Callaway's statement to the police states, "several of the passengers were walking about the first class cabin, visiting with each other and using the lavatory". 'C' flight attendant LeeAnne Maykuth's Cabin Safety Report (CSR) states, "I proceeded to FC (first class) where 3-4 pax were lingering, standing around talking"

4

(ASA 019). There is absolutely nothing in that statement that indicates any violation of any policy or regulation according to the materials at my disposal as provided by Alaska Airlines. Ms. Callaway continues by stating the she "felt that the passengers were getting too close to the cockpit door". This is clearly a subjective determination as there is no line or other demarcation indicating exactly where is too close and where is not. While Ms. Callaway is free to make a subjective determination, the truth is that the forward lavatory on a Boeing 737-400 is immediately adjacent to the cockpit thereby making it impossible to get to the lavatory without being next to the cockpit door. 'B' flight attendant Robin Duus states in her CSR that the man from seat 1D, to whom Ms. Callaway was speaking, was told by Ms. Callaway that he could not stay by the front but could wait by row 6 near the divider between first class and coach. He apparently complied with this request because Ms. Duus says, "one man went to row 6 when she (Ms. Callaway) said that if he were waiting to use the bathroom he would need to wait at row 6" (ASA21).

The various statements all indicate that the conflict between the cabin crew and the passengers arose when Ms. Callaway requested that they return to their seats. The passengers offered a reasonable explanation for their desire to stand and, their reluctance to comply with her wish was seen by her as a challenge to her authority, and as a threat. None of the reports contain any account or description of any specific threat being made by the passengers, yet this seems to be the point around which all the subsequent events occur.

The Alaska Airlines 'Inflight services Training' manual section on '**Customer disturbances/incidents/violence/assault**' contains guidance for all situations involving

5

passenger – crewmember conflict. Page 3 (ref. ASA 047) states, "Fortunately, the skills needed to deal with customers exhibiting disruptive behavior, you already have! Every flight attendant has had training in the 'Common strategy' and you will cultivate those skills while dealing with all kinds of customers." The common strategy gives guidance, which was not followed on this occasion. It says (same page) "**B=Behavior** 1. Self Control, as mentioned earlier, respond without emotion. You have to control yourself first before controlling an aggressor". The bottom of the same page continues with a section titled "**The key fundamentals**" wherein is states (page 4 ASA 048) in bold letters, "Respond without emotion". The next paragraph states (again bolded) "you can allow the customer to think he or she is right, and never go looking for a fight". Three paragraphs later the manual states, "Another consideration, or key, is treat the customer with respect. Onboard the aircraft, miles above the ground, may not always be the best place to argue the point or flex the ego."

   I offer these points to provide a backdrop for the subsequent interactions between the captain and the FFA. Captain Swanigan's statement to the Reno Police states, "Was advised by cabin crew that passengers were congregating near the flight deck door and they would not stop doing it when ordered. She said things were getting out of hand. I decided to land the jet at nearest airport." Several things stand out in this statement. First, no specific violation or threat was reported other than the passengers were near the cockpit door, which is not in and of itself a violation. As previously stated, it is impossible to access the forward lavatory without coming in proximity to the cockpit door and this was, in fact, the stated reason the passenger was there. Second, Captain Swanigan's report gives no indication that he inquired further into the details of the

disturbance nor discussed any possible alternative actions that could be attempted to calm the situation. He does not indicate that he received any explanation as to the cause of the disturbance. Captain Swanigan's Captain's report to Alaska Airlines, written with a bit more detail and after time to reflect still does not state that he attempted to understand the situation prior to making the decision to divert to RNO. His Captain's Report states that he received a briefing from FFA Callaway only after landing. He says (ASA 042, bottom of page) "I put F/O Roberts in command of the airplane and I took FFA Callaway to the top of the Jetway for a private briefing on what had transpired." Referring once again to the Alaska Airlines handbook page 3 (ASA 047) states under the heading '**C= Communication**', "Communication is critical with the flight deck." This appears not to have occurred and I believe that it is always incumbent upon the pilot in command to solicit all pertinent information when any issue is raised by a crewmember during the conduct of a flight.

   The captain of a flight is also responsible and obligated to provide leadership to the crew. That leadership appears in many forms and among those is the responsibility to remind crewmembers of their duties and their responsibilities and to provide guidance when appropriate to help them accomplish those duties.

   I believe there are several actions Captain Swanigan could have taken that would have significantly reduced the conflict on the aircraft and which would have allowed the flight to continue to destination.

   1. Captain Swanigan could have immediately turned on the seat belt sign and made an announcement from the flight deck, personally directing the passengers to be seated as a means of helping 'A' F/A Callaway defuse the situation.

It is common for flight attendants to call the cockpit requesting that the seat belt sign be turned on and an announcement made by the captain as a means of seating passengers when they (the flight attendants) feel there are too many people standing or congregating in one place. In my experience this has always been effective. Captain Swanigan does state that he initiated "Cockpit Lockdown Procedures" which included turning on the seat belt sign.  However, this action was taken in response to a perceived threat rather than as a means of helping defuse the situation, which at this point, according to the reports, had not yet escalated beyond an issue of passengers not obeying a flight attendant's wish that they be seated.

2. If 'A' F/A Callaway felt she could not get the particular passenger she was dealing with to respond properly, Captain Swanigan could have offered to speak with that passenger on the interphone personally. Personal contact with the captain has always been an effective means of controlling most situations. Since the enhanced security procedures following the events of 9/11 the ability of pilots to deal with passengers face to face has been significantly reduced. They are not, however, prohibited from speaking with passengers on the interphone. This event occurred during the cruise portion of the flight, which is traditionally the low workload portion of the trip. It would have been very reasonable for the captain to turn the airplane over to the F/O and handle the situation by interphone.

3. Since the issue at hand was the fact that the passenger would not be seated, that eventual outcome should have been priority information for the captain. All the reports available to me indicate that the passengers did eventually sit down. I cannot find anything in any of the reports that indicate Capt. Swanigan made a point of being

informed of the fact that the passengers ultimately complied with the demand to be seated.

4.Captain Swanigan could have directed or reminded FFA Callaway to follow the procedures in her manuals and try her best not to inflame the situation. The Inflight Training Manual clearly states, (page 3 ASA 047) "Do not solicit statements at this time. All that is needed are the names and addresses." Several of the reports indicate that the "screaming and yelling" portion of the event occurred after the passengers had taken their seats and were then approached by the flight attendants with forms to fill out. At this time the flight attendants also made very inflammatory statements such as "shut up", "Zip it", "I'll make the authorities arrest you" and "You will all go to jail". Statements such as these can do nothing but inflame a situation and as captain Captain Swanigan should have seen to it that no such behavior on the part of his crew was permitted. Again, the direction in the manual to "Respond without emotion" would have been beneficial in this instance ".

5. Captain Swanigan could have and should have directed 'A' F/A Callaway to inform the passengers, in a calm and professional way, that their behavior could lead to law enforcement action if not halted immediately. This action is presented in the Inflight Training Manual as another means to get passengers to comply. Page 5 (ASA 049) states, "The Promise Of Law Enforcement – Sometimes, just the threat of police intervention may be all you need to get the customer to stop". Statements from the passengers police reports indicate that the first time they were made aware of any possible legal threat was when the announcement was made that the plane was diverting to RNO and the flight attendant told them they were all going to jail.

None of the reports indicate any violence of any sort. None of the reports indicate any issuance of specific threats on the part of the passengers. All of the reports indicate that the passengers did eventually take their seats and apparently behaved properly for the remainder of the flight once the emotions of the moment were past. Obviously, the captain was at a bit of a disadvantage by not being present to witness the events as they unfolded. However, he had at his disposal tools and means of ascertaining the extent of the conflict and determining if any credible threat was present. It is understandable that emotions can play a part in any interaction between disagreeing people and it is for this reason that the training manuals give specific guidance in determining threat levels of customer behavior. Flight crews are expected to understand customer behavior and are specifically trained in the "Psyche of the disruptive passenger" (page 1 ASA 045) to consider many factors in dealing with people. According to the definitions as provided in the training manual, it is my opinion that no assault, intimidation, threat or interference with the crew was committed.

I feel it appropriate to make one additional observation here. The distance from Vancouver to Las Vegas, (862nm), by normal flight plan routing is only 257 nm farther than the distance from Vancouver to Reno (605nm). The reports state that the plane was approximately 65nm past Reno when the first contact from the 'A' flight attendant was initiated. That conversation would have taken a minute or more. According to the captain's statement, the decision to divert, and the actual turn towards Reno occurred "a few minutes later" (ASA 042). The plane was traveling at approximately 8-9 nm/min so even 5 minutes elapsed time would move the plane an additional 40-45 miles closer to destination. That would put the plane about 110 miles past RNO or about 150 miles from

10

Las Vegas. A normal descent, which Capt. Swanigan says he made, would require about 110-120 miles to execute. The difference in time between continuing to Las Vegas vs. diverting to Reno was the time it would take to fly an additional 30-40 miles or about 4-5 minutes. It seems to me a small price to pay to get the passengers to their intended destination in LAS vs. RNO with the ensuing delay, especially in light of the fact that the F/A's request was for assistance in LAS with no request to get the plane on the ground immediately and with no violence or threatening behavior being displayed.

It is my opinion that there were deviations from established policy and deficiencies in crew co-ordination and communication leading to hasty decision-making and the unnecessary diversion of the flight and subsequent inconveniencing of all of the passengers onboard.


*Mark Swint*

Captain Mark S. Swint

Case 2:04-cv-01304-MMD-CWH Document 287-5 Filed 12/03/12 Page 13 of 15

# Addendum 1

**Exhibit List**;

Exhibit A - Reno/Tahoe Airport Police Department police reports of passenger and crew written statements.   Pages 4-16 of 16

Exhibit B - Reno/Tahoe Airport Police Department continuation report written by Officer R. Beharry, badge #306,   Pages 1-3 of 16

Exhibit C – "Passenger Disturbance/Diversion" report, written by Captain Michael Swanigan.   Pages ASA 041-ASA044

Exhibit D - Alaska Airlines Inflight Training Manual.   Pages ASA 045-ASA 074

Exhibit E - FAA Advisory Circular AC 120-65   Pages 1-20

Exhibit F – Cabin Safety Reports   Pages ASA 019-ASA 022

12

# Addendum 2

**List of published articles**.

(Copies of all listed articles can be obtained on line at, www.SWAviator.com under the past issues link.)

August 1999:       "Mexican Mountain"

October 1999:      "Fremont Island"

December 1999:    "Mineral Canyon, Utah"

February 2000:     "Tangri-La, Utah Back Country"

April 2000:        "Hot Spring Heaven"

June 2000:         "Wet and Wild at Echo Bay"

August 2000:       "Fly-Fishing Getaway, Green River Utah"

October 2000:      "San Juan River Magic"

December 2000:     "Pima Air & Space Museum – Preserving the Best of the Boneyard"

February 2001:     "Bar 10 Ranch – Grand Canyon Adventure"

April 2001:        "New Attitude in Old Mexico"

August 2001:       "Feet Wet in Laughlin – Adventures of a New Seaplane Pilot"

November 2001:     "Fly Away to Big Bear"

March 2002:        "Life on the Edge – Tuweep Arizona"

May 2002:          "Glenwood Springs – Colorado's Hidden Treasure"

September 2002:    "Rediscovering the Magic of Route 66"

November 2002:     "Marble Canyon Magic"