UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| REDA A. GINENA, NAHID I. GINENA, AMRE R. GINENA, SABRINA KOBERT, M. MAGDY RASIKH, M. SAMIR MANSOUR, AZZA EID, NAZMI M. NAZMI, and HEBA NAZMI, <br><br>Plaintiffs, <br><br>v. <br><br>ALASKA AIRLINES, INC., <br><br>Defendant. | 2:04-CV-01304-MMD-CWH <br><br> ORDER |

Before the court is Plaintiffs' Motion for a New Trial (#418[1]). Defendant Alaska Airlines, Inc. ("Alaska") has responded (#425), and Plaintiffs have replied (#426).

**I.    Facts and Procedural History**

Following a two-week trial on Plaintiffs' two claims, a jury returned a verdict in favor of Alaska. (Jury Verdict #390; Judgment #394.) Accordingly, Alaska is "entitled to have the evidence viewed in a light most favorable to [it], resolving conflicts in [its] favor and giving [it] the benefit of reasonable inferences." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1016 (9th Cir. 2008) (quotation marks and citation omitted).

///

---

[1] Refers to the court's docket number.

On September 29, 2003, Plaintiffs boarded Alaska Airlines Flight 694 from Vancouver, British Columbia to Las Vegas, Nevada. The flight, carrying 105 passengers and crew, (Alaska's Trial Ex. 501), was piloted by Captain Michael Swanigan, a thirty-three year veteran of Alaska Airlines and Vice President of Alaska's flight operations. (8 Trial Transcript ("Tr.") 252:10-14; 8 Tr. 282:6-7.)

About one hour into the flight, approximately 65 miles south of Reno, Nevada, Swanigan received a call over the airplane's phone system from flight attendant Dalee Callaway. (9 Tr. 13:11-23.) Callaway was known to Swanigan as an experienced flight attendant. (8 Tr. 269:16-22.) Callaway alerted Swanigan to a problem with the first-class passengers, stating, "We're probably going to need to have security meet the airplane." (9 Tr. 13:13-14.) As a means of quieting potential passenger unrest, Swanigan turned on the "fasten seatbelt" sign. (9 Tr. 14:10-12.)

Callaway had over twenty-two years of flight attendant experience at the time of her testimony. (9 Tr. 67-68.) She testified she had problems with Plaintiffs from the time they boarded the plane's first-class section. (9 Tr. 73:10-20.) One member of Plaintiffs' party was using her cell phone during the pre-flight safety briefing (which required that the briefing be started anew), and she interrupted the briefing further when she took a second call. (9 Tr. 73-75.) Another member was upset when his meal choice was not available. (*Id*.) Other members of Plaintiffs' party stood and talked in the plane's aisle while the flight attendants were attempting to accomplish meal service. (9 Tr. 77-78.) The plane was a Boeing 737 and first class passengers were seated in the three front rows of the plane with only one aisle for passenger and flight attendant access throughout the plane. (Alaska's Trial Exs. 503, 511.) When Callaway admonished one plaintiff for blocking the aisle, he told her that she was being "paranoid." (9 Tr. 81:1-5.) Even after several requests, members of Plaintiffs' party refused to be seated, (9 Tr. 81:8-13), and the situation grew more heated.

A short time later, Callaway distributed an "in-flight disturbance form" to the passengers, which she described as "a warning, basically, to let them know that they're teetering on a violation

of a federal air regulation." (9 Tr. 82:20-22.) Members of Plaintiffs' party took offense at the forms and some alternately crumpled and ripped up their forms, throwing the tatters at Callaway. (9 Tr. 83-84.) One male plaintiff angrily called Callaway a "stupid blond bitch." (9 Tr. 85:22-23.)

Callaway then called Swanigan a second time and told him, "I [have] lost control of the first-class cabin." (9 Tr. 87:6-7.) (This was about five minutes after Callaway's first call. (9 Tr. 15:22-24.)) Swanigan described Callaway as "distraught and sobbing" on this call, and he heard people shouting in the background, mainly male voices (the flight attendants were all female). (9 Tr. 16:6-15.) At this point, Swanigan decided to divert the plane to Reno. (9 Tr. 17:3.)

Swanigan testified that there were three primary reasons for his decision to divert the aircraft: (1) that a seasoned flight attendant called (following her first call about the likelihood of needing security) and informed him that she had "lost control" of the first class cabin, (2) that she was "clearly, clearly distraught and sobbing" and (3) that he could hear mainly male passenger voices shouting in the background. (9 Tr. 16: 5-15.) Swanigan checked with his copilot, who confirmed he heard the same thing. (9 Tr. 16-17.) With that, Swanigan felt the airplane was in jeopardy, the passengers were in jeopardy, and he was going to do whatever it took to protect the passengers and airplane. (9 Tr. 17:12-18.) He decided to divert the plane to the nearest available airport, Reno-Tahoe. (9 Tr. 17:21-25.) In his thirty-three year career, he has never diverted any other flight. (9 Tr. 17:19-20.)

Once in Reno, law enforcement officers boarded the plane. (9 Tr. 36:7-11.) Callaway briefed Swanigan on everything that had happened, and Swanigan had the officers escort Plaintiffs off the plane. (9 Tr. 36-37.) He banned the Plaintiffs' group from continuing on the flight. (9 Tr. 43:10-14.) Swanigan then filled out a police report. (9 Tr. 37:18-23.) The police questioned the disembarked passengers within the airport terminal. (3 Tr. 148:13-16.) Following those interviews, the police declined to take further action. (3 Tr. 150-55.) Plaintiffs then took a later America West flight to Las Vegas that arrived in Las Vegas approximately three hours after Flight 694. (Plaintiffs' Trial Exs. 7, 14; 6 Tr. 202:4-6.)

3

The following day, Alaska employee Frank Raymond, an "Aviation Safety Action Program" manager, received a call from a federal air marshal inquiring about the diversion and requesting a report on behalf of Alaska. (4 Tr. 152:11-13; 4 Tr. 208:2-4.) After reviewing the information available, including two or three emails from other Alaska employees, Raymond wrote and sent a report to the Air Marshal's office at its customary email address. (4 Tr. 184-85; 4 Tr. 246:4-9.) At the time, Raymond did not know that the Air Marshal's office was a part of the federal government's Joint Terrorism Task Force ("JTTF") and was not aware of what the JTTF was. (4 Tr. 200:11-12.) This email recited the facts of the disturbance as Raymond understood them. (4 Tr. 247:8-10.) Raymond also wrote that Plaintiffs' tickets were one-way tickets, that changes had been made to each ticket, that eight of the plaintiffs had been involved in the disturbance, and that Plaintiffs were of Middle-Eastern descent. (Plaintiffs' Trial Ex. 25.)

Plaintiffs brought several claims against Alaska, but only two went to trial: a claim for defamation under state law (based on Raymond's email) and a claim for delay under the Convention for the Unification of Certain Rules Relating to International Carriage by Air, Oct. 12, 1929, 49 Stat. 3000 ("Warsaw Convention"). They asked for $36 million for the defamation claim alone. (11 Tr. 92:15; 11 Tr. 102:18; 11 Tr. 102:25; 11 Tr. 105:2; 11 Tr. 107:3; 11 Tr. 108:3; 11 Tr. 110:24; 11 Tr. 112:18.) The jury returned a verdict in favor of Alaska on both claims, and Plaintiffs subsequently filed this Motion for a New Trial.

**II.    Discussion**

Plaintiffs allege three principal sources of error warranting a new trial. First, Plaintiffs allege that the court erroneously instructed the jury on their delay claim. In particular, the court's instructions "focused" on delay caused by the plane's diversion rather than on delay caused by other sources, the court's instructions misstated the reasonableness standard under which Swanigan's actions were evaluated, and the court should have given Plaintiffs' proposed instructions. Second, Plaintiffs allege that the court erroneously instructed the jury with respect to the defamation claim (by misstating the actual malice standard) and that the defamation verdict was

4

against the clear weight of the evidence. Third, Plaintiffs allege that defense counsel's misconduct warrants a new trial.

Generally, "[a] party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). A party may object by submitting proposed instructions supported by relevant authority, as long as those instructions are "sufficiently specific to bring into focus the precise nature of the alleged error." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1230 (9th Cir. 2011) (citation and quotation marks omitted). The failure to object means that the court may only consider, upon review, "a plain error in the instructions that . . . affects substantial rights." *Id*.

Following a proper objection, however, the court reviews the objected-to instruction under standards that differ depending on the nature of the objection. Errors in the formulation of an instruction or in determining whether sufficient evidence warrants the instruction at all are reviewed for abuse of discretion. *See United States v. Gomez–Osorio*, 957 F.2d 636, 642 (9th Cir. 1992). Errors concerning whether the instructions "fairly and adequately cover the issues presented, [] correctly state the law, and [are not] misleading" are reviewed *de novo*. *Hunter*, 652 F.3d at 1232. If "the error in the jury instruction is harmless, it does not warrant reversal." *Dang v. Cross*, 422 F.3d 800, 805 (9th Cir. 2005). An erroneous jury instruction gives rise to a presumption of prejudice, which the victorious party must rebut by showing that "it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Id*. at 811.

**A. Delay Claim**

Plaintiffs' delay claim arises under Article 19 of the Warsaw Convention, which provides that "[t]he carrier is liable for damage occasioned delay in the carriage by air of passengers, luggage, or goods." Another treaty, the Tokyo Convention, provides legal immunity to the carrier if the pilot disembarks passengers who he has "reasonable grounds" to believe have committed an offense or jeopardized "good order and discipline" on board. *See* Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Sept. 14, 1963, Articles 1, 8, and 10, 20 U.S.T.

5

2941, 704 U.N.T.S. 219 ("Tokyo Convention"). Plaintiffs object to instructions concerning the interplay of these two treaties.

### 1. The Focus on Diversion

Plaintiffs argue that the jury instructions on their Warsaw Convention claim and the Tokyo Convention defense were flawed because they focused on delay as a result of the airplane's diversion to Reno. Plaintiffs contend that two other sources of delay—the delivery of Plaintiffs to law enforcement and Swanigan's refusal to let Plaintiffs reboard—should have been presented to the jury in the jury instructions.

Plaintiffs did not properly object on these grounds, and therefore this issue is reviewable as plain error. *See* Fed R. Civ. P. 51(d)(2). Plaintiffs suggest that their alternative instructions, which the court did not adopt, suffice to "bring into focus the precise nature of the alleged error." *Hunter*, 652 F.3d at 1230. A quick glance at Plaintiffs' proposed instructions belies this suggestion. The phrases Plaintiffs use are "delay in transportation by air" and "delay." (*See* Plaintiffs' Proposed Instructions #337, Nos. 28, 29, 35, 36.) These phrases do not "bring into focus" either delay caused by law enforcement or delay caused by Swanigan's refusal to let Plaintiffs reboard. Accordingly, this alleged error must be "plain error" affecting Plaintiffs' "substantial rights" if it is to be reviewable error at all. Fed. R. Civ. P. 51(d)(2). The undisputed evidence was that once the captain diverted the Alaska flight to Reno, the delay to Las Vegas imposed upon Plaintiffs was a single period of delay occasioned by the difference in the arrival times in Las Vegas of the two flights, approximately three hours.

Plaintiffs have failed to demonstrate that the focus on diversion was plain error. In evaluating whether a particular jury instruction was plainly erroneous, the court considers "the jury instructions as a whole." *See Swinton v. Potomac Corp.*, 270 F.3d 794, 802 (9th Cir. 2001). A broader view of the jury instructions reveals that Plaintiffs agreed to a description of their delay claim in the following way: "Plaintiffs are suing for money damages for a several hour delay of international travel arising from the diversion to the Reno-Tahoe International Airport of Flight

6

694." (Jury Instructions #385, No. 13.) Other jury instructions, like Instruction No. 30, noted that "Plaintiffs cannot recover any damages, *other than those directly tied to their delay*, related to the captain's report to the Reno Police." (*Id.* at No. 30 (emphasis added).) These instructions make clear that the diversion led to subsequent events that were included within the period of delay. And this is what the court instructed in Instruction No. 22, in which the court identified "damage, if any, for delay *caused by* the diversion of flight 694 to Reno." (*Id.* at No. 22 (emphasis added).) Accordingly, Plaintiffs have failed to demonstrate that the use of the word "diversion" was plain error affecting their substantial rights. *See Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 517 (9th Cir. 2004).

### 2. Reasonableness Instruction

Plaintiffs also fault Instruction No. 19 for misstating the reasonableness standard to be applied under the Tokyo Convention.[2] Instruction No. 19 provided:

> Right to Refuse Transportation: An airline is justified in refusing to transport a passenger if that transportation, in the opinion of the pilot, would be inimical to the safety of the flight. In judging the legality of a denial of passage, you must look to the opinion of the airline pilot, and that opinion controls, if it is a reasonable opinion based on the facts and circumstances as they appear to the pilot at the time that the decision was made. It is not what is reasonable in hindsight, but what appears to be reasonable at the time.

(Jury Instructions #385, No. 19.) Plaintiffs argue instead that a pilot's opinion is reasonable only in light of what the pilot knew "or [] should have known." (Plaintiffs' Motion for New Trial #418, p. 5.)

There are two clear problems with Plaintiffs' argument. First, Instruction No. 19 is (largely) a direct quotation from *Cordero v. Cia Mexicana De Aviacion, S. A.*, 681 F.2d 669, 670 n. 2 (9th Cir. 1982), a case interpreting the domestic disembarkation statute. In *Eid v. Alaska Airlines, Inc.*, 621 F.3d 858 (9th Cir. 2010), the Ninth Circuit held that the standard for reasonableness under the Tokyo Convention "is consistent with our cases applying the analogous statute for domestic air

---

[2] Plaintiffs properly objected to this instruction, and therefore it is reviewed *de novo*. *Hunter*, 652 F.3d at 1232.

7

travel, [the *Cordero* statute's successor] 42 U.S.C. § 44902(b)." Second, the *Eid* court noted that "[r]easonableness is a well-established and easily-understood standard."621 F.3d at 868. These points both suggest that the court's Instruction No. 19 tasking the jury with applying a "reasonableness" standard was not in error.

Moreover, the chief evil of which Plaintiffs complain—that Instruction No. 19 does not permit a reasonableness determination based on facts the pilot "should have known"—is absent. In the context of defining a standard of care, the phrase "should have known" denotes a duty of reasonable inquiry. *See, e.g.*, *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (discussing whether a party "should have known" of a claim by reference to "whether a reasonable person in [the party's] situation would have been expected to inquire" about the facts giving rise to the claim). Instruction No. 19 readily allows the jury to conclude that, "based on the facts and circumstances as they appear[ed] to the pilot at the time" he formed his opinion, a reasonable pilot would have conducted further inquiry before diverting the plane. Indeed, Plaintiffs presented testimony that further inquiry was warranted. (*See* Plaintiff's Motion for New Trial #418, p. 6:9-12.) The jury, apparently, disagreed.[3]

### 3. Refusal to Give Plaintiffs' Instructions

Plaintiffs challenge the jury instructions as misleadingly incomplete. The principal objection is that the court failed to instruct on a Tokyo Convention defense to the Warsaw Convention delay claim.[4] This defense, provided in Article 9 of the Tokyo Convention, states that

---

[3] It is also arguable that domestic law applied once the plane had landed in Reno and once Plaintiffs had disembarked. The *Eid* court held that *domestic* law applied to events on the flight from Reno to Las Vegas. *See Eid*, 621 F.3d at 874 (holding that the Warsaw Convention applies "so long as the plaintiff is still on the airplane, embarking onto the plane or disembarking from the plane"). Since Swanigan's denial of transport was arguably not part of the process of disembarkation from or of embarkation on an international flight, domestic law arguably applies to this denial. In that case, the *Cordero* instruction was even more apt.

[4] Plaintiffs initially objected to the court's omission of six of their proposed instructions. However, Plaintiffs' Reply (#426) only addresses the omission of Plaintiffs' Proposed Instruction No. 37, which embodies the Tokyo Convention's Article 9. (Plaintiffs' Proposed Instructions #337, No.

8

the pilot "may deliver to the competent authorities . . . any person who he has reasonable grounds to believe has committed on board the aircraft an act which, in his opinion, is a serious offense according to the penal law of the state of registration of the aircraft."[5] Plaintiffs desire an instruction on Article 9 because Swanigan's decision to deliver Plaintiffs to airport police "requires even stronger support than merely removing [them] from the plane." *Eid*, 621 F.3d at 871.

However, Plaintiffs cannot force Alaska to assert a defense it does not want to assert. And Alaska chose not to defend against the delay claim as it relates to Swanigan's "delivery" of Plaintiffs to the airport police. Alaska likely reasoned, first, that delay associated with the delivery was absent,[6] and second, that its other defenses to delay were sufficient. For example, Alaska asserted a defense that it "is not liable if it proves that [it] took all necessary measures to avoid the damage [for the delay]." (Jury Instructions #385, No. 22.) Plaintiffs insist that the failure to instruct on Article 9 "reads Article 9 out of the Tokyo Convention," but it is hard to know what to make of this argument. (Plaintiffs' Reply #426, p. 5:1-2.) Does a statutory defense become "mere surplusage" because a defendant elects not to assert it? Surely not.

Plaintiffs also point to Instruction No.17, which recites 49 U.S.C. § 46504, as evidence that the jury instructions were misleadingly incomplete. Section 46504 prohibits "[i]nterference with flight crew members and attendants," and Plaintiffs suggest that this is the "serious offense"

---

37.) Plaintiffs failed to specifically object to the omission of these instructions at trial, and the text of these instructions does not "bring into focus" the nature of Plaintiffs' objection. (10 Tr. #411, pp. 157-161.) Accordingly, Plaintiffs must surmount the hurdle of the plain error standard with respect to these instructions, and they have failed to do so. *See* Fed. R. Civ. P. 51(d)(2).

[5] One would question whether there was a "delivery" to the airport police. The captain decided to divert the plane to Reno based on his belief that the passengers and the airplane were in jeopardy due to the in-flight disturbance by the Plaintiffs' group. He asked to have airport police present, and the police were present when the plaintiff passengers exited the aircraft. These passengers were interviewed by police, the police concluded that the matter was a civil matter and not criminal, and no arrests were made or considered. The disembarked passengers took the next flight to Las Vegas.

[6] Importantly, Plaintiffs presented no evidence that the removal of Plaintiffs from the aircraft or the taking of statements by police caused delay beyond that caused by the initial diversion.

contemplated by their Article 9 instruction. While Instruction 17 is relevant to the standard of reasonableness by which the jury could judge Swanigan's conduct, even if Instruction No. 17 had been incomplete without a corresponding instruction on Article 9, this error was harmless.

### 4. Harmless Error

The error was harmless because it is more likely than not that the jury would have come to the same decision had the court either omitted Instruction No. 17 or included an Article 9 instruction. *See Dang*, 422 F.3d at 811 ("We presume prejudice where civil trial error is concerned and the burden shifts to the [plaintiffs] to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed.") Plaintiffs' delivery to the police is relevant to Plaintiffs' delay claim only to the extent it affected the ultimate delay. (*See* Jury Instructions #385, No. 30 ("Plaintiffs cannot recover any damages, other than those directly tied to their delay, related to the captain's report to the Reno Police.").) This is true whether the delivery was justified or unjustified (since Alaska elected to forgo its Article 9 defense). Therefore, an instruction requiring the jury to determine whether the delivery to the police was, in fact, justified would have been unnecessary. The failure to instruct on Article 9, if indeed error, was harmless error because (after Alaska decided not to assert it as a defense) Article 9 did not bear on an ultimate issue in the case. The jury's decision would have been the same.

### B. Defamation

Plaintiffs went to trial on a defamation claim premised on Raymond's email to the Federal Air Marshals. Because the court ruled that the email fell within Nevada's law enforcement reporting privilege, *see Pope v. Motel 6*, 114 P.3d 277, 284 (Nev. 2005), Plaintiffs had to demonstrate that the email was published with actual malice in order to succeed. Plaintiffs move for a new trial on the basis of the allegedly erroneous actual malice instruction as well as on the basis that the defense verdict on the defamation claim was against the clear weight of the evidence.

### 1. Erroneous Actual Malice Instruction

Plaintiffs object that the instruction on actual malice was erroneous. In its entirety, this

10

instruction read

> Actual malice is a stringent standard which is defined as knowledge of the falsity of a statement or a reckless disregard for its truth. Reckless disregard for the truth may be defined as a high degree of awareness of the probable falsity of a statement. *It may be found if Frank Raymond, as an employee/agent of Defendant Alaska Airlines entertained serious doubts* as to the truth of the statement, but published it anyway. As such, it is a subjective test*, focusing on what Frank Raymond as an employee/agent of Defendant Alaska Airlines believed and intended to convey* at the time the message was conveyed. Evidence of negligence, motive, and intent may cumulatively establish necessary recklessness to prove actual malice in a defamation claim.

(Jury Instructions #385, No. 37 (emphasis added).) In particular, Plaintiffs object to the emphasized portions, which, they argue, prevented the jury from considering Alaska's "state of mind" as a corporation. (Plaintiffs' Motion for New Trial #418, p. 9:1-5.) In support of the proposition that the jury must consider the "actual malice of the organization itself," (*id*. at 10:4), Plaintiffs mainly rely on the "collective knowledge doctrine." *See United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987).[7]

Plaintiffs' objections on the basis of the collective knowledge doctrine are without merit. In *United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987), the court held that

> Corporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components. The aggregate of those components constitutes the corporation's knowledge of a particular operation. It is irrelevant whether employees administering one component of an operation know the specific activities of employees administering another aspect of the operation.

Plaintiffs rely on this holding to argue that the knowledge of all of Alaska's employees—including Raymond, Raymond's co-worker Angela Kelley, and Swanigan—should be taken into account in determining Alaska's actual malice. This is so, Plaintiffs continue, even if no individual employee acted with actual malice.

Both commentators and later decisions have undermined the force of *Bank of New*

---

[7] Alaska responds that Plaintiffs failed to properly object to the actual malice instruction. This is wrong. Plaintiffs objected to Instruction No. 37 at least two times, and both times Plaintiffs specifically articulated their wish to see "defendant" rather than "Frank Raymond" in Instruction No. 37. (*See* 4 Tr. 136-46; 11 Tr. 14:18-19.) Therefore, Plaintiffs' objections are reviewed under a *de novo* standard. *Hunter*, 652 F.3d at1232.

11

*England*'s collective knowledge doctrine. *See, e.g.*, Thomas A. Hagemann & Joseph Grinstein, *The Mythology of Aggregate Corporate Knowledge: A Deconstruction*, 65 Geo. Wash. L. Rev. 210, 226-36 (1997) (collecting and describing cases). In particular, Hagemann and Grinstein have persuasively described *Bank of New England*'s holding as a gloss on criminal culpability and willful blindness: "[b]efore courts will collectivize knowledge, they will first demand a showing that corporations deliberately attempted somehow to compartmentalize or avoid inculpatory information." *Id*. at 237-38. Moreover, later decisions, including those applying the actual malice standard to corporations, have shied from applying the collective knowledge doctrine to culpable states of mind. For instance, in *First Equity Corp. of Florida v. Standard & Poor's Corp.*, 690 F. Supp. 256 (S.D.N.Y. 1988) (Mukasey, J.) *aff'd,* 869 F.2d 175 (2d Cir. 1989), a defamation case in which the actual malice standard was at issue, the court held, "While it is not disputed that a corporation may be charged with the collective knowledge of its employees, it does not follow that the corporation may be deemed to have a culpable state of mind when that state of mind is possessed by no single employee." 690 F. Supp. at 260. The *First Equity* court cited the Ninth Circuit's decision in *Kern Oil & Refining Co. v. Tenneco Oil Co.*, 792 F.2d 1380 (9th Cir. 1986) for support. There, this Circuit declined to find that a corporation made "knowing and voluntary payments" where one corporate department knew the actual price, one department knew the contract price, but no department knew both prices. *See Kern Oil*, 792 F.2d at 1387. And these decisions all accord with *Reed v. Nw. Pub. Co.*, 530 N.E.2d 474 (Ill. 1988), in which the Illinois Supreme Court blocked the plaintiff's attempt to "circumvent the [actual-malice] requirement . . . by pooling all of the information arguably within the knowledge of various employees and imputing all of that knowledge to the corporate defendant to establish that the corporate defendant acted with actual malice."

These holdings make sense. Principally, they guard against a court-led expansion of criminal and civil liability. As Hagemann and Grinstein argue, the collective knowledge doctrine conflates "knowing" culpability with "negligent" culpability, at least when applied to corporate

12

wrongdoing. *See* Hagemann and Grinstein, *supra*, at 238-41. For instance, the collective knowledge doctrine favors liability where various corporate agents have different pieces of information, but the corporation was negligent in compiling these pieces of information. *See id.* But then liability is premised on negligence, not on the "intentional" conduct that is at the heart of the higher levels of mens rea, knowing and willful conduct. *See* Model Penal Code § 2.02(2). Accordingly, the court predicts that the Nevada Supreme Court would not adopt *Bank of New England*'s collective knowledge doctrine in the manner Plaintiffs urge. *See Burlington Insurance Co. v. Oceanic Design & Construction, Inc.*, 383 F.3d 940, 944 (9th Cir. 2004) (holding that the court must predict how the state supreme court would decide on state law issues of first impression).[8]

Plaintiffs' policy arguments do not suggest a different result. Plaintiffs argue that, in the absence of the collective knowledge doctrine, corporations have "license to libel" because a corporation could assign the task of drafting and publishing defamatory messages to innocent employees. (Plaintiffs' Reply #426, p. 14:3-8.) This does not follow. In the situation described by Plaintiffs, the corporation may still be liable for defamation. The plaintiff would simply need to show that someone in the corporation had the required culpability. Plaintiffs' proposed instructions Nos. 8 and 24 fail for similar reasons: they incorrectly describe the actual malice standard by encouraging the jury to infer corporate culpability through the collective knowledge doctrine.

At trial, Plaintiffs failed to show that Raymond, who drafted and published the alleged defamatory email, possessed actual malice. Plaintiffs also failed to produce evidence warranting an instruction that other Alaska employees involved in the email's publication acted with actual

///

///

---

[8] Though Plaintiffs rely heavily on the Nevada cases *Posadas v. City of Reno*, 851 P.2d 438 (Nev. 1993) and *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82 (Nev. 2002), Plaintiffs have cited no case in which a Nevada court has held a corporation liable for knowing or willful conduct (or for actual malice) when no agent of the corporation possessed a knowing or willful state of mind.

13

1  malice.[9] And Plaintiffs failed to produce evidence that Alaska practiced "willful blindness" with
2  respect to the email's alleged falsity. Therefore, the court's Instruction No. 37 properly described
3  the actual malice standard.

### 2.     Verdict against the Clear Weight of the Evidence

Plaintiffs have moved for a new trial under Federal Rule of Procedure 59. Upon a Rule 59 motion, the court has a duty to weigh the evidence as it sees it, and to set aside the jury's verdict if, "in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." However, the court is mindful that the "credibility of witnesses and the weight of the evidence are issues for the jury that are generally not subject to [] review." *Guy v. City of San Diego*, 608 F.3d 582, 585 (9th Cir. 2010).

The heart of Plaintiffs' defamation claim is Raymond's email's alleged "gist" that "[P]laintiffs were terrorists." (Plaintiffs' Motion for New Trial #418, p. 16:12-13.) In support of this gist, Plaintiffs allege that Raymond falsely reported the number of Plaintiffs involved in the disturbance; that Raymond falsely represented whether Plaintiffs' tickets were one-way or round-trip; that Raymond falsely claimed that "several changes" were made to each ticket; that Raymond reported Plaintiffs' "Middle-Eastern descent" but not the fact that some of them had Canadian passports; and that the email was produced voluntarily, without a request from the Federal Air Marshals.

At trial, Alaska produced evidence that Raymond's email was prepared within hours of a request from the Air Marshal's office for a report concerning the diversion. (4 Tr. 208:2-4.) Raymond prefaced his email with a disclaimer: "This information is not 100% complete." (*See*

---

[9] Plaintiffs place special emphasis on Raymond's co-worker Kelley, who wrote in an email, "It shocks me as to why the police don't follow-up on interference w/ a crewmember." (Plaintiffs' Reply #426, p. 10:12-19.) Plaintiffs also rely on Kelley's response in her deposition that she knew Raymond's email was headed to the JTTF. (7 Tr. 202:13-17.) These pieces of evidence fail to join the actual malice issue for at least two reasons. First, Plaintiffs presented no evidence that Kelley suggested content for Raymond's email or even reviewed Raymond's email prior to its publication. Second, Plaintiffs presented no evidence that Kelley acted with a culpable state of mind.

14

Plaintiffs' Trial Ex. 25.) As far as Raymond knew, eight passengers were involved in the disturbance. (*See* 4 Tr. 207:4-20 (relying on co-worker's email); Plaintiffs' Trial Ex 22 (co-worker's email).) As far as Raymond knew, Plaintiffs had booked one-way tickets. (*See* 4 Tr. 248:21-25 ("[O]ur systems showed just the flights that were booked on Alaska Airlines. So on those records, it showed one-way tickets.").) And the evidence showed that at least three plaintiffs made changes to their Alaska tickets. (*See* Trial Ex. 44.) Finally, Plaintiffs' "Middle-Eastern descent" is not in dispute. Such evidence is more than sufficient for a reasonable jury to conclude that Raymond did not act with malice.

Plaintiffs and Alaska skirmished heavily over whether Raymond's email was unsolicited and whether he knew it would end up with the Joint Terrorism Task Force. However, while Raymond provided direct testimony that the email was solicited by the Marshals, (4 Tr. 208:2-4), and that he did not know of the JTTF or the Marshal's relationship to the JTTF, (4 Tr. 200:11-21), Plaintiffs' contrary evidence was weak at best. Plaintiffs point out that Raymond didn't write down the name of the caller from the Marshal's office; that Raymond began the email "To Whom It May Concern;" that Raymond's email did not specifically mention the Marshals' phone call; that Raymond incorrectly recalled at the time of his deposition whether he reviewed the captain's report before or after he wrote the email. (Plaintiffs' Motion for New Trial #418, pp. 17-20.) The jury obviously chose to accept Raymond's testimony over Plaintiffs' challenges to his credibility. The jury's verdict is not against the weight of evidence on the defamation claim.

**C. Defense Counsel Misconduct**

Finally, Plaintiffs allege that two statements by Alaska's counsel warrant a new trial. First, Plaintiffs argue that Alaska's counsel violated this court's order by asking two questions intended to elicit evidence earlier excluded by the court. Second, Plaintiffs allege that Alaska's counsel, during his closing argument, implied that Plaintiffs had bribed a witness. These challenges arise against the background of a lengthy two-week trial in which 22 witnesses testified and over 130 exhibits were admitted.

15

1  When a new trial motion is premised on attorney misconduct, "[t]he question is whether counsel's misconduct so permeated the trial as to lead to the conclusion the jury was necessarily influenced by passion and prejudice in reaching its verdict." *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir. 1991). Even where counsel's remarks are improper, if they are "isolated rather than persistent," or if they fail to elicit an objection, they will usually not warrant a new trial. *Kehr v. Smith Barney, Harris Upham & Co., Inc.*, 736 F.2d 1283, 1286 (9th Cir. 1984).

Here, Alaska's counsel's remarks do not warrant a new trial. First, the court addressed the improper questions at trial: the testimony in response was "limited," the violation of the court's ruling *in limine* was not willful, future violations did not occur, and the court issued a limiting instruction that read "Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been." (9 Tr. 100-01. *See also* Jury Instructions #385, No. 7.) This is the type of "isolated rather than persistent" misconduct that fails to "necessarily influence" the jury's decision. Second, Alaska's counsel's remarks during closing did not draw an objection from Plaintiffs; the objectionable comments comprise a total of twenty-four words;[10] and the remarks occurred during the "argument phase" of trial (with the jury instructed accordingly). Alaska's counsel's defense of these remarks is unpersuasive (along the lines of "but she was paid the standard $40 witness fee, so these remarks were not technically false"). While the comments are indefensible, however, even improper comments do not warrant a new trial when they are isolated, unobjected-to argument. And these comments were. *See Kehr*, 736 F.2d at 1286.

\\\

\\\

\\\

\\\

---

[10] Plaintiffs italicize the following words as objectionable: "[The witness] *was coached, and, I would suggest, paid for her testimony. But before she was engaged by attorneys to provide testimony for the plaintiffs*, she had given her testimony to the FBI, and her statement is very interesting." (Plaintiffs' Motion for New Trial #418, p. 24:24-26.)

16

### III. Conclusion

Plaintiffs have not identified any error warranting a new trial.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for a New Trial (#418) is DENIED.

IT IS SO ORDERED.

DATED this 19th day of June, 2013.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE